UNITED STATES of America, Plaintiff–Appellee,

v.

Anthony ESPARSEN, Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

Kelly ESPARSEN, Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

Robert McFADDEN, Defendant–Appellant.

Nos. 90–2043, 90–2054, 90–2059.

United States Court of Appeals, Tenth Circuit.

April 18, 1991.

**1464**

Stephen P. McCue, Asst. Federal Public Defender, Albuquerque, N.M., for defendant-appellant Anthony Esparsen.

Paul J. Kennedy, Albuquerque, N.M., for defendant-appellant Kelly Esparsen.

Vicki Mandell–King, Asst. Federal Public Defender (Michael G. Katz, Federal Public Defender, with her on the briefs), Denver, Colo., for defendant-appellant Robert McFadden.

Robert J. Gorence, Asst. U.S. Atty. (William L. Lutz, U.S. Atty., and James D. Tierney, Asst. U.S. Atty., with him on the briefs), Albuquerque, N.M., for plaintiff-appellee U.S.

Before LOGAN and MOORE, Circuit Judges, and SPARR, District Judge.[*]

JOHN P. MOORE, Circuit Judge.

Defendants Anthony Esparsen, Kelly Esparsen, and Robert McFadden appeal their jury convictions, in the United States District Court for the District of New Mexico, on multiple counts involving cocaine distribution. We consolidate the three cases into one opinion because of some overlap in the issues. Initially, all three defendants complain that the prosecution exercised its peremptory challenges in a prima facie discriminatory manner against Hispanic venire members. Mr. McFadden questions the sufficiency of the evidence to support his conviction for aiding and abetting three cocaine sales. All three defendants question the sufficiency of the evidence on the charge of conspiracy to distribute over 500 grams of cocaine, and Messrs. McFadden and Anthony Esparsen raise a few related evidentiary questions. Finally, Mr. Anthony Esparsen argues his supervised release sentence exceeds the statutory maximum. We affirm the trial court's finding that no prima facie case of discrimination existed, uphold the jury's convictions on the substantive counts, and remand for recalculation of Mr. Anthony Esparsen's supervised release term.

Between December 11, 1987, and February 1, 1989, defendants were involved in five sales of less than 500 grams of cocaine to government agents in New Mexico. Defendants were also implicated in discussions of larger sales with an agent. On

---

[*] The Honorable Daniel B. Sparr, United States District Judge for the District of Colorado, sitting by designation.

December 11, 1989, a jury was seated over defendants' objections to the prosecution's peremptory challenges. The jury convicted defendants on multiple counts of distributing less than 500 grams of cocaine, and of conspiracy to distribute over 500 grams of cocaine. The court sentenced Kelly Esparsen to forty-two months in prison and five years of supervised release; Anthony Esparsen to sixty months in prison and six years of supervised release; and Robert McFadden to sixty months in prison and five years of supervised release.

## I. Prosecution's Use of Peremptory Challenges

Defendants assert that the prosecution used four of its six peremptory challenges and its one challenge against an alternate juror to strike Hispanic members of the venire. The trial court erred, they complain, in finding that such action does not constitute a prima facie case of discrimination under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). They argue the prosecution must provide a neutral explanation for its strikes according to *Batson*'s equal protection framework.

### A. Prima Facie Standard

■ To establish a prima facie case: (1) the defendant must show he is a member of a cognizable racial group, and that the prosecution has exercised peremptory challenges to remove members of a particular race from the venire;[1] (2) the defendant is entitled to rely on the fact that peremptory challenges are a jury selection practice which permits discrimination by those who wish to discriminate; and (3) the defendant must show that these facts and other relevant circumstances raise an inference that the prosecutor used that practice to exclude the venire members from the

petit jury on account of their race. *Id.* at 96, 106 S.Ct. at 1722.

The *Batson* Court suggested a few possible indicators of a prima facie case, but entrusted the task of fleshing out this skeletal framework to trial courts experienced in voir dire. *Id.* at 97, 106 S.Ct. at 1723. Relevant factors could include disproportionate impact, *id.* at 93, 106 S.Ct. at 1721; a pattern of strikes against jurors of a particular race; or the prosecutor's questions and statements during voir dire. *Id.* at 97, 106 S.Ct. at 1723. We therefore review the trial court's determination with deference to its firsthand observation of the circumstances of each case.

### B. Applying the Standard

■ We hold that the trial court correctly found no prima facie evidence of discrimination, although we base our ruling on different reasoning. The trial judge responded to defendants' objection by stating that it was not obvious to him, either from their names or appearance, that the Esparsens were Hispanic, and that some Hispanics remained on the final jury. When defendants offered to supplement the record with proof that the Esparsens were indeed Hispanic, the trial judge emphasized that his ruling was based on the fact that "other Hispanics ... remained on the panel that could have been challenged that were not challenged."

The trial court conducted voir dire for the thirty-six-member venire. It excused three members, Thomas C. Blisard, Lucille E. Cardella, and Elmer C. Yazzie, for cause. The prosecution used its first and third peremptory challenges against Susan S. Kennedy and Mary C. Pennington. With the other four of its six peremptory challenges, the prosecution struck Angie Armijo, Margaret A. Martinez, Josephine L. Lucero, and Cynthia M. Castillo, whom de-

---

1. Although *Batson* originally referred to the removal of "members of defendant's race," 476 U.S. at 96, 106 S.Ct. at 1722, the Supreme Court has recently declared "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same race." *Powers v. Ohio,* — U.S.

—, 111 S.Ct. 1364, 1366, 112 L.Ed.2d 411, 1991 WL 41528, *2. Therefore, Robert McFadden has standing to challenge the exclusion of Hispanic jurors even though he is Caucasian. The standing of the Esparsens is not disputed on appeal, although the trial judge initially stated they did not appear obviously Hispanic.

fendants assert are Hispanic. The prosecution first tried to use its one challenge against an alternate to strike Michael Zamora, who was already on the panel, but eventually struck alternate Robert Rivera. At trial, defendants claimed that Mr. Rivera was Hispanic. On appeal, they also contend he was the only Hispanic alternate,[2] and that Mr. Zamora is Hispanic. The following persons sat on the final jury: Carol A. Manning, Steve A. Gutierrez, Cynthia A. Longenbaugh, Pierre J. Carrica, Harry D. Heilman, Marleen E. Dugger, Kay C. Holt, Roy L. Cox, Juanita R. Hancock, Michael A. Zamora, Tom Nez, and an alternate because Jacki K. Anderson did not appear. On appeal, the government asserts that three of those persons, Mr. Gutierrez, Mr. Carrica, and Mr. Zamora, are Hispanic.

This court has applied *Batson* twice, but neither case provides specific guidance for the present situation. We concluded in *United States v. Chalan*, 812 F.2d 1302, 1313–14 (10th Cir.1987), that the government's peremptory strike of the last potential American Indian juror created a prima facie case of discrimination. We noted that the striking of a single juror[3] will not always constitute a prima facie case, but, when no members of defendant's race remain because of that strike, it does. In this case, we cannot ascertain from the record that no Hispanics remained on the final jury. In *United States v. Brown*, 817 F.2d 674, 675–76 (10th Cir.1987), we reviewed the adequacy of the prosecution's explanation of its actions at a trial court hearing. We assumed, as the trial court apparently did, a prima facie case existed based on the prosecution's challenge of all potential Afro–American jurors, and its phone call to the jury clerk seeking to discuss Afro–Americans on the venire. In this case, the prosecution did not conduct voir dire and requested no additional questions which signaled racial motivations.

Defendants have failed to present a record which raises an inference that the prosecution struck potential jurors because they were Hispanic. The burden of creating a record of relevant facts belongs to the defendants. *United States v. Dawn*, 897 F.2d 1444, 1448 (8th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 389, 112 L.Ed.2d 400 (1990); *United States v. Sangineto–Miranda*, 859 F.2d 1501, 1520 (6th Cir. 1988).

### 1. Number of Hispanics Struck

Defendants assert that the prosecution used five out of seven strikes and the first mistaken alternate strike against Hispanics, but they fail to establish with certainty the racial identity of the venire members struck by the prosecution. Defendants' claim that Ms. Armijo, Ms. Martinez, Ms. Lucero, Ms. Castillo, Mr. Rivera, and Mr. Zamora are Hispanic appears to rest solely on their surnames. While such an inference seems plausible, it rests on the assumptions that these surnames are Hispanic, and that people with Hispanic surnames are Hispanic. For instance, some of the four women might have Hispanic surnames only because they married Hispanics. Although we recognize that racial identity may be clear from appearances during voir dire, we cannot sustain a *Batson* challenge on conjecture. Moreover, even appearances do not always provide a reliable guide, as shown by the trial court's initial opinion that the Esparsens did not appear Hispanic. *See United States v. Bucci*, 839 F.2d 825, 832 (1st Cir.), *cert. denied*, 488 U.S. 844, 109 S.Ct. 117, 102 L.Ed.2d 91 (1988) (claim that prosecutor's peremptory challenges violated Sixth Amendment rejected because no evidence presented on which surnames are Italian–American and what surnames indicate about ethnicity or race).

---

**2.** The other three alternates were Sharon B. Wallace, Charles M. Peterson, and Dino Bernardone.

**3.** The *Chalan* venire originally had four American Indians. Two were removed for cause and the government used its peremptory challenges to remove the other two. Since one of the last two could have been removed for cause because of language problems, the court treated the case as if three had been removed for cause and one was struck by the government. 812 F.2d at 1313–14.

Defendants rely on the Supreme Court's statement in *Castaneda v. Partida*, 430 U.S. 482, 495, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), that "Spanish surnames are just as easily identifiable as race was from the questionnaires in *Alexander* [*v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972)] or the notations and card colors in *Whitus v. Georgia*, [385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967)] ... and in *Avery v. Georgia*, [345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953)]" (citations omitted). The Court found a prima facie case of discrimination in the Texas grand jury selection system because of a statistical disparity in the percentage of Mexican–Americans in the county and the percentage summoned for grand juries. The statistics were based "[o]n the assumption that all the persons of Spanish language or Spanish surname were Mexican–Americans...." *Id.* at 486, 97 S.Ct. at 1275. In *Castaneda*, however, the Court relied on official census categorizations rather than counsel's surmises about names and their racial significance.[4] Moreover, when analyzing the use of peremptory challenges, it becomes both more realistic and important to identify precisely the race of venire members because the numbers involved are much smaller. For instance, the ethnicity of thirty venire members could be determined by looking not only at surnames but also at appearance, jury questionnaires, or answers to court questions. The statistical significance of erroneously identifying a person's ethnicity also becomes much greater when the number of people involved is in the tens rather than thousands.

### 2. Proportion of Strikes Against Hispanics

■ Even if surnames were adequate evidence of ethnicity, the record remains insufficient to support a prima facie case. Although *Batson* prohibits striking even one juror based on racial grounds, it does not suggest that the exclusion of jurors of a cognizable race automatically creates a prima facie case of discrimination. By itself, the number of challenges used against members of a particular race is "not sufficient to establish or negate a prima facie case." *Dawn*, 897 F.2d at 1448; *see also United States v. Horsley*, 864 F.2d 1543, 1546 (11th Cir.1989). The number takes on meaning only in the context of other information such as the racial composition of the venire,[5] the race of others struck by the prosecution,[6] or the voir dire answers of those who were struck compared to the answers of those who were not struck. *See United States v. Moore*, 895 F.2d 484, 486 (8th Cir.1990); *Sangineto–Miranda*, 859 F.2d at 1520; *United States v. Clemons*, 843 F.2d 741, 748 (3d Cir.), *cert. denied*, 488 U.S. 835, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988).

In this case, for instance, the prosecution's use of 71% (⁵/₇) of its challenges against Hispanics would acquire some statistical meaning if we knew the percentage of Hispanics in the venire. The names of the venire members, with potentially Hispanic surnames italicized, are as follows:

---

**4.** "Persons of Spanish Language or Spanish Surname" was a census designation, based in part on a list of 8,000 Spanish surnames compiled by the Immigration and Naturalization Service. 430 U.S. at 486, n. 5, 97 S.Ct. at 1276, n. 5.

**5.** Although some courts have suggested that the racial composition of the judicial district from which the venire is selected may be relevant, we do not agree. *See Sangineto–Miranda*, 859 F.2d at 1520; *United States v. Clemons*, 843 F.2d 741, 748, n. 5 (3d Cir.), *cert. denied*, 488 U.S. 835, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988). Our goal in comparing the number of strikes against Hispanics to the number of available Hispanics is to discern a possible indicator of discriminatory intent in a disproportionate strike rate. For this purpose, only the racial composition of the universe in which the prosecutor was operating is relevant.

**6.** The government urges us to consider that defendants themselves struck three Hispanic jurors, but the government's claim rests on the same defective assumptions about Hispanic surnames. Defendants exercised their ten challenges against Neal A. McEwen, Phyllis L. Caponera, Ted M. Kear, Ray A. Abbott, Margie L. Lewis, George Lloyd, Norma Chavez, Jacob G. Salazar, Judy A. Blue, and Mildred B. Anderson. Furthermore, the defendants' actions, ironic as they may seem, simply tell us nothing about the prosecution's intent.

Ted M. Kear, Susan S. Kennedy, Carol A. Manning, *Angie Armijo*, Ray A. Abbott, *Steve A. Gutierrez*, Cynthia A. Longenbaugh, *Lucille E. Cardella*, Margie L. Lewis, Mary C. Pennington, *Margaret A. Martinez*, George Lloyd, *Norma Chavez*, Thomas C. Blisard, Pierre J. Carrica, *Jacob G. Salazar*, Harry D. Heilman, Judy A. Blue, Marleen E. Dugger, Mildred B. Anderson, *Cynthia M. Castillo*, Kay C. Holt, Elmer C. Yazzie, Neal A. McEwen, *Josephine L. Lucero*, Roy L. Cox, Jacki K. Anderson, Juanita R. Hancock, *Michael A. Zamora*, Tom Nez, *Phyllis L. Caponera, Robert Rivera*, Sharon B. Wallace, Charles M. Peterson, Dino Bernardone, Kathy A. Clevenger.

Based on names alone, 33% ($^{12}/_{36}$) of the venire appears to be Hispanic. However, this attempt to discern the number of Hispanics in the venire from the transcript further exposes the weakness of relying on surnames. For instance, *Juanita* Hancock could be a Hispanic married to a man with a non-Hispanic name. The government, in its appellate brief, alternately asserts there were eleven or twelve Hispanics in the venire. Defendants make no effort to establish the racial composition of the venire.

Another possible statistical comparison would be the rate at which Hispanics were struck compared to the rate at which non-Hispanics were struck. *United States v. Temple*, 890 F.2d 1043, 1046 (8th Cir.1989). For instance, if we assume twelve in the venire were Hispanic and the rest were Caucasians, and that the prosecution's other two strikes were against Caucasians, we could compare a 42% ($^{5}/_{12}$) Hispanic strike rate to an 8% ($^{2}/_{24}$) Caucasian strike rate. However, we simply cannot base a decision on speculation about such numbers.

This discussion merely illustrates two ways of making the number of strikes used against members of a particular race statistically meaningful. We do not establish at this time any rule on what amount of statistical disparity constitutes a prima facie case. Nor do we intend to diminish the significance of non-numerical factors, such as the demeanor of potential jurors, the

prosecutor's behavior, or the voir dire answers of venire members of different races. Defendants proffer two such factors in this case but neither is persuasive. We cannot discern any racial significance in the prosecution's use of "the last three in a row" of its challenges against allegedly Hispanic venire members. The prosecution's two attempts to strike an alternate might be suggestive if we were certain that the targets were both Hispanic.

### 3. Hispanics Not Struck by the Prosecution

■ The government relies on the trial court's reasoning that some Hispanics sat on the final jury and the prosecution had two other challenges which it could have used against them. Although the mere presence of members of a certain race on the final jury does not automatically negate a *Batson* violation, *Clemons*, 843 F.2d at 748, it can be a relevant factor, particularly when the prosecution had the opportunity to strike them. *See United States v. Grandison*, 885 F.2d 143, 147 (4th Cir. 1989), *cert. denied*, — U.S. —, 110 S.Ct. 2178, 109 L.Ed.2d 507 (1990) (one factor disproving discrimination was that prosecution did not exercise its last challenge, although Afro–Americans remained in the venire). However, the trial court's reasoning suffers from the same factual uncertainty as defendants' claim about the number of Hispanic jurors struck. The trial court does not tell us how many Hispanics remained or what basis it had for thinking some were Hispanic. In its brief, the government depends on surnames to suggest that three Hispanics (Gutierrez, Carrica, and Zamora) remained. If we were certain that 25% ($^{3}/_{12}$) of the final jury was Hispanic, and 33% of the venire [7] was Hispanic, we could consider those figures along with the fact that the prosecution did not use all its strikes against Hispanics as factors tending to disprove discriminatory intent.

In conclusion, the defendants simply have not provided enough facts to establish

---

7. Again, we focus on disproportionate impact created within the prosecution's world.

a "pattern" of discriminatory strikes. In the absence of such information, we defer to the trial court's judgment that no prima facie case of discrimination existed.

## II. Aiding and Abetting in the Distribution of Less Than 500 Grams of Cocaine (Robert McFadden)

The jury convicted Mr. McFadden on three counts of aiding and abetting the distribution of less than 500 grams of cocaine. Count I charged Mr. McFadden with aiding and abetting the sale of one-quarter gram of cocaine on December 11, 1987. Counts II and VIII made the same charge for one-half gram and one ounce[8] transactions on December 17, 1987, and December 2, 1988, respectively. Mr. McFadden challenges the court's striking certain testimony about his presence at these transactions and the sufficiency of the evidence that he aided and abetted the sales. We affirm on both issues.

### A. Stricken Testimony

 Maurice Hamm appeared as a defense witness but invoked his Fifth Amendment privilege in response to almost all cross-examination questions. The trial court struck Mr. Hamm's testimony because he had not been subject to cross-examination. Mr. McFadden asserts that striking Mr. Hamm's testimony compromised his right to present a defense, violating both his Fifth Amendment right to due process and his Sixth Amendment right to compulsory process. Unless the trial court has abused its discretion, we will not disturb its decision to strike testimony because of restricted cross-examination. *United States v. Doddington*, 822 F.2d 818, 822 (8th Cir.1987); *United States v. Seifert*, 648 F.2d 557, 562 (9th Cir.1980).

A defendant's right to present witnesses "has long been recognized as essential to due process." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). That same right also arises from the compulsory process clause of the Sixth Amendment because the right to compel the appearance of witnesses has

meaning only if it includes the right to present their testimony. *Taylor v. Illinois*, 484 U.S. 400, 409, 108 S.Ct. 646, 652, 98 L.Ed.2d 798 (1988); *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). However, these rights are not absolute. The Sixth Amendment, for instance, " 'does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth.' " *Taylor*, 484 U.S. at 412–13, 108 S.Ct. at 654 (citing *United States v. Nobles*, 422 U.S. 225, 241, 95 S.Ct. 2160, 2171, 45 L.Ed.2d 141 (1975)). Reaching the truth is a fundamental goal of trials, and cross-examination is critical to the process. *Lawson v. Murray*, 837 F.2d 653, 656 (4th Cir.), *cert. denied*, 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988) (citing *United States v. Havens*, 446 U.S. 620, 626, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980), and *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974)).

 Courts have balanced these competing concerns by drawing a line between direct and collateral matters. A defendant cannot invoke due process or compulsory process rights to immunize his witnesses from cross-examination on issues relevant to the truth of the direct testimony. For instance, the Fourth Circuit struck a defense witness's testimony that the defendant was not with him on a certain night when the witness refused to answer specific questions about what he was doing that night. *Lawson*, 837 F.2d at 655. *See also Doddington*, 822 F.2d at 822; *United States v. Lord*, 711 F.2d 887, 892 (9th Cir. 1983); *United States v. Frank*, 520 F.2d 1287, 1292 (2d Cir.1975), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976). When the refusal to answer cross-examination questions involves collateral matters, we have held in the analogous situation of a prosecution witness who invokes the Fifth Amendment that the testimony should not be struck. *United States*

---

8. One ounce equals approximately 28 grams.

v. *Nunez*, 668 F.2d 1116, 1122 (10th Cir. 1981). *See also United States v. Castello*, 830 F.2d 99, 101 (7th Cir.1987), and *Seifert*, 648 F.2d at 561–62.

When Mr. Hamm refused to respond to cross-examination, the trial court had reason to suspect that he was telling half-truths. Several of the questions specifically probed for details to support his direct testimony. Mr. Hamm testified on direct examination that he was not with Mr. McFadden on either December 11, 1987, or December 17, 1987, the dates of two transactions carried out with Detective Eddie Montoya. He also testified that on those days he was with Gordon Cook (Mr. McFadden's stepbrother) and Kelly Esparsen in Mr. Cook's Datsun. Because it is undisputed that three persons were in the Datsun which met Detective Eddie Montoya, and that two of those persons were Maurice Hamm and Kelly Esparsen, this testimony suggested that Mr. Cook, rather than Mr. McFadden, was the third person at those transactions.

Among the questions Mr. Hamm refused to answer on cross-examination were: (1) Where did he go after noon on December 11, 1987? (sale of cocaine took place around 2:00 p.m.); (2) Was he with Kelly Esparsen and Gordon Cook in the Datsun during the early afternoon hours of December 17, 1987? (sale of cocaine took place around 2:30 p.m.); and (3) Did he go to the Lot–a–Burger on Isleta Boulevard (location of the cocaine sale) with Gordon Cook and Kelly Esparsen on December 17? These questions were not designed merely to implicate Mr. Hamm because his presence at the transactions was established by other testimony. Rather, they tested the truth of the proposition that Mr. McFadden was not present by pressing for details on Mr. Cook's and Mr. Hamm's actions at the actual times and places of the transactions.

The trial court correctly struck Mr. Hamm's testimony because Mr. Hamm refused to answer questions on matters going to the heart of his direct testimony. *See Doddington*, 822 F.2d at 822. In *Lawson*, which involved similar facts, the court did note that striking testimony is a drastic

remedy, so the court should consider whether it is possible to strike only portions of the testimony. As in this case, however, the direct testimony was quite brief and could not be split into admissible and non-admissible portions. *Lawson*, 837 F.2d at 656.

**B. Sufficiency of Evidence**

Mr. McFadden seeks to overturn his conviction on Counts I, II, and VIII for aiding and abetting, alleging the evidence is insufficient to support the jury verdict. We consider all the evidence in the light most favorable to the government when reviewing the sufficiency of the evidence to support a jury verdict in a criminal case. The evidence is sufficient if a reasonable jury could find the defendant guilty beyond a reasonable doubt. In making our determination, we refrain from second-guessing the jury's assessment of witness credibility. *United States v. Levario*, 877 F.2d 1483, 1485 (10th Cir.1989).

To be guilty of aiding and abetting a crime, the defendant must willfully associate himself with the criminal venture and seek to make it succeed through some action on his part. *United States v. Zamora*, 784 F.2d 1025, 1031 (10th Cir.1986). The government must prove more than mere presence at the scene of the crime even if coupled with knowledge that the crime is being committed. However, participation may be established by circumstantial evidence, and the evidence may be of " 'relatively slight moment.' " *United States v. Taylor*, 612 F.2d 1272, 1275 (10th Cir.1980), *cert. denied*, 444 U.S. 1092, 100 S.Ct. 1060, 62 L.Ed.2d 782 (1980) (quoting *United States v. Garguilo*, 310 F.2d 249, 253 (2d Cir.1962)).

The threshold question raised by Mr. McFadden is whether he was even present at the December 11 and 17, 1987 transactions (Counts I and II). However, his claim requires reweighing the credibility of conflicting testimony given at trial, a task beyond our province. Sergeant Eddie Montoya, the undercover agent who purchased the cocaine, testified that Mr. McFadden was present on both occasions,

and Deputy Sheriff Robert Radosevich, who conducted surveillance, testified that he thought he saw Mr. McFadden on December 17. Mr. McFadden argues, based on cross-examination, that the written reports only identified a Caucasian male living at a certain address,[9] and that the detectives neither analyzed fingerprints on items allegedly touched by Mr. McFadden nor considered that he had a brother. Mr. McFadden further relies on testimony by Gordon Cook, his stepbrother, that Mr. Cook is often confused with Mr. McFadden, and that Mr. Cook was the one at the December 11 and 17 transactions. Considering this contradictory evidence in the light most favorable to the government, and deferring to the jury's assessment of witness credibility, we cannot say the jury acted irrationally in deciding Mr. McFadden was present.

▮ Given Mr. McFadden's presence at the transactions, we are also convinced that a rational jury could find that he willfully took part in them. Sergeant Montoya's testimony provides direct evidence of Mr. McFadden's knowledge of and participation in the December 11, 1987 transaction (Count I). That day, Mr. McFadden, Mr. Kelly Esparsen, and Mr. Hamm met Sergeant Montoya at a prearranged time and place. They arrived in a Datsun driven by Mr. McFadden, with Mr. Esparsen in the front passenger seat and Mr. Hamm in the rear. Sergeant Montoya stood on the driver's side of the car and conversed briefly with Mr. Esparsen about the transaction, asking about a quarter gram of cocaine. At Mr. Esparsen's direction, Mr. Hamm handed a bank bag to Mr. McFadden, who selected one of the cocaine packets within, gave it to Sergeant Montoya, and accepted $25 from him. On December 17, 1987 (Count II), Mr. McFadden was in the car which met Sergeant Montoya, although this time Mr. Hamm got out of the car and conducted the sale at Sergeant Montoya's car. On December 2, 1988 (Count VIII), Mr. McFadden was again in the car while Mr. Esparsen spoke with Detective Larry Garcia about buying an ounce. Mr.

McFadden was not at the actual sale which took place about ten minutes later at another location designated by Mr. Esparsen, but he picked up Mr. Esparsen after the transaction was completed. Although the evidence for December 17, 1987, and December 2, 1988, could have an innocent interpretation, it is of enough moment to prove aiding and abetting when combined with Mr. McFadden's clear knowing participation in a similar transaction on December 11, 1987. *See King v. United States*, 402 F.2d 289, 290–91 (10th Cir.1968) (defendant's participation in the interstate transport of a false check inferred from his use of the same name to forge a different check).

III. Conspiracy to Distribute Over 500 Grams of Cocaine (Robert McFadden, Kelly Esparsen, Anthony Esparsen)

All three defendants challenge the sufficiency of the evidence on Count IX, conspiracy to distribute over 500 grams of cocaine between December 11, 1987, and February 1, 1989. 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B). The Esparsens focus on challenging the existence of a conspiracy while Mr. McFadden further contends that even if a conspiracy existed, he was not a knowing member. Again, we consider all the evidence in the light most favorable to the government and determine whether a reasonable jury could find the defendants guilty beyond a reasonable doubt.

▮ The core of a conspiracy is an agreement to commit an unlawful act. For each defendant, the government must show (1) a conspiracy existed, (2) the defendant knew the essential objectives of the conspiracy, and (3) the defendant knowingly and voluntarily became a part of it. *United States v. Savaiano*, 843 F.2d 1280, 1294 (10th Cir.1988). In *Savaiano*, we dispensed with the overt act requirement for drug conspiracies under 21 U.S.C. § 846. We also set forth a number of guidelines for applying our test. Direct or circumstantial evidence may be considered. The defendant need not know all the details of

**9.** Detective Garcia testified that Mr. McFadden's name did appear on his second report.

the operation and may play only a minor role or have only a slight connection to the conspiracy. Mere presence at the scene of the crime does not, by itself, prove involvement but is a material factor. *Id.*

### A. Elements of Conspiracy

#### 1. Existence of Conspiracy

 Defendants suggest several ways in which the government has failed to prove the existence of a conspiracy to distribute over 500 grams of cocaine. They first demand proof of an overt act, but *Savaiano*, as noted above, has abolished that requirement. They also contend there was no evidence that they ever possessed 500 grams of cocaine, but possession is not a necessary element of a conspiracy to distribute.[10] Moreover, Detective Garcia testified that on January 31, 1989, Kelly told Detective Garcia he had just received five kilograms of cocaine.

 Defendants also argue that no conspiracy to distribute over 500 grams existed because each of the transactions between December 11, 1987, and February 1, 1989, was a separate and distinct deal. However, we have held that separate transactions can constitute a single conspiracy if they are " 'essential and integral steps toward the realization of a common illicit goal.' " *United States v. Dickey,* 736 F.2d 571, 582 (10th Cir.1984), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985) (quoting *United States v. Brewer,* 630 F.2d 795, 799 (10th Cir.1980)). Distributing drugs for profit is such a goal, and individual transactions can all be a part of that scheme. *Id.; United States v. Nunez,* 877 F.2d 1470, 1473 (10th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 513, 107 L.Ed.2d 515 (1989).

 The fundamental requirement of an agreement among the three defendants[11] to distribute cocaine for profit can rationally be inferred from the frequent contacts among them and their joint appearances at transactions and negotiations. A review of key events and conversations shows that the evidence is sufficient to support the jury's conviction.

In December 1987, Sergeant Montoya conducted two transactions with the aid of Brenda Sandoval, an informant connected to Kelly Esparsen. As described in Section II, Kelly Esparsen and Robert McFadden were involved in the transactions on December 11 and December 17. In the fall of 1988, government agents arranged four more transactions, two with the help of Ms. Sandoval and two through Teresa Molina, an informant connected to Anthony Esparsen.

Ms. Molina made half-ounce purchases of cocaine from Anthony Esparsen on August 23, 1988, and November 15, 1988. Recorded conversations between them included remarks by Anthony which betrayed substantial experience in cocaine deals. At one point, he told Ms. Molina that he couldn't get her "a half" right then because she "just missed it. Cause once I get it in it goes out and you know. It goes out right away." On November 15, they conducted the sale near the Rio Grande High School. They discussed the quality and potency of the "powder" Anthony was selling Ms. Molina, and he told her how he had seen a woman overdose on it and almost die. "[I]t's all coke, man," he said, advising her that he didn't use it himself, but "I just know what I'm selling by what the people tell me, you know?" In response to her suggestion that her buyers might want larger amounts, he told her that when she was sure, he would talk price, but he would

---

**10.** The Esparsens erroneously rely on *United States v. Ayala,* 887 F.2d 62, 68 (5th Cir.1989), which required possession to support a conviction for *possession* with intent to distribute under 21 U.S.C. § 841(a)(1). Notably, the court did not require possession to establish a violation of conspiracy to possess with intent to distribute under 21 U.S.C. §§ 841(a)(1) and 846.

**11.** The Esparsens rely on an alleged lack of agreement with Detective Garcia to carry out proposed six-ounce, half kilogram, and one kilogram transactions. Detective Garcia's intent is irrelevant, however, because government agents cannot be coconspirators. Nevertheless, his meetings and conversations with defendants can be evidence of conspiracy among the defendants. *United States v. Elledge,* 723 F.2d 864, 866 (11th Cir.1984).

not meet them personally because she would lose the opportunity to make money as a go-between.

Ms. Sandoval arranged a meeting between Detective Larry Garcia and Kelly Esparsen which also took place on November 15 near the Rio Grande High School. Kelly arrived in a car driven by Anthony. Detective Garcia stepped to the passenger side of the car and talked with Kelly about buying an ounce for $1100. Kelly told Detective Garcia to look for him walking along Mares Road in five minutes. They completed the transaction there, and Detective Garcia testified that, "Kelly made a comment to me, if you need any more, just get a hold [sic] of me."

On December 2, 1988, Detective Garcia bought another ounce for the same price. This time, Kelly arrived at the meeting in a car with Robert McFadden and a child as passengers. Standing next to the car, Detective Garcia asked, "[Y]ou got it or you want to go?" Kelly told Detective Garcia to meet him in a few minutes at a car wash, where he appeared alone on foot. The exchange of money and cocaine took place, and Kelly and Detective Garcia conversed about a possible six-ounce transaction. The recording of the conversation again revealed Kelly's savvy in drug dealing. He expressed concern about delivering six ounces together because if something went wrong, "six alone gives, me, gave me about 48 months." Kelly stated that previously, "We were moving at full force.... Right now you're the only one I'm giving anything to.... We had guys who were buying 15–20." Now, however, he urged caution because "[t]here's heat on us." When Detective Garcia broached the possibility of buying one kilogram as soon as he got enough money, Kelly asked how much he had paid in the past and told him, "I'll let you have it for nineteen [thousand]."

A series of negotiations about a one-kilogram deal ensued over the next two months. After a few short conversations between Detective Garcia and Kelly, the following key events took place. On January 17, 1989, Kelly and Detective Garcia discussed price and logistical arrangements at a two-hour meeting at the Chapter II Lounge. Robert McFadden was also present at that meeting although there is some dispute over how much he knew and heard because he barely spoke to Detective Garcia, and the music and noise in the lounge were quite loud.[12] On January 18, 1989, around 1:20 p.m., Detective Garcia called Kelly who said he needed to find out what was happening. About half an hour later, surveillance detectives observed Kelly arriving at Furr's Cafeteria, and then saw Anthony and Robert McFadden arrive together and join him. On January 26, 1989, Detective Garcia, Kelly, and Anthony met at Garduno's Restaurant and discussed the one-kilogram transaction at length. Preoccupied with avoiding the "Feds," the Esparsens probed for further information about Detective Garcia's background and pondered ways to transfer the money and cocaine separately. On January 31, 1989, Kelly told Detective Garcia on the phone that he had run a complete background check and found out "soothing" things, so "as long as me and you are straight there's no problem." Detective Garcia testified that at a brief meeting shortly afterwards, Kelly said he had received five kilos but had already promised four and one-half to others, so they settled on $9500 for a half kilo.[13] On February 1, 1989, Detective Garcia and Kelly talked briefly on the phone again and Mr. Esparsen stated, "it doesn't look any better than what I told you yesterday." Later that day, Robert McFadden called Detective Garcia with the message that Kelly "can't do anything no more with you.... Because those phones that you were talking to.... They're tapped, man."

Taken together, the incidents between December 11, 1987, and February 1, 1989, provide sufficient evidence of an agreement to distribute cocaine. The defendants' "common design" to profit from drug dealing can be inferred from the completed sales, the defendants' joint activities, and the detailed negotiations on the one-kil-

---

**12.** The tape recording of this conversation was unintelligible.

**13.** The tape recording of this conversation was also unintelligible.

ogram deal. *See United States v. Staggs,* 881 F.2d 1546, 1550 (10th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 719, 107 L.Ed.2d 739 (1990). Despite the last minute pullout, the January 31 conversation finalized the intent to sell a half kilogram to Detective Garcia.

### 2. Mr. McFadden's Membership in the Conspiracy

■ Mr. McFadden's knowledge of the objectives of the conspiracy and his voluntary participation in it are also supported by sufficient evidence. He actively participated in the December 11, 1987 transaction. He was present and in a position to see and hear what was happening during the December 17, 1987 and December 2, 1988 transactions, and during the January 17, 1989 negotiation at the Chapter II Lounge. On January 18, 1989, he met at Furr's Cafeteria with the other two defendants right after Kelly told Detective Garcia he had to find out what was happening. Finally, he called Detective Garcia and cancelled the half-kilogram deal. These facts belie his claim that he was simply an occasional unwitting messenger for Kelly Esparsen.[14] *See United States v. Hunt,* 877 F.2d 833, 834 (10th Cir.1989) (defendant's argument that he was present at the meeting place but excluded from the meeting defeated by evidence that he asked for information on buyers and completed drug transactions).

### B. Evidentiary Disputes

Defendants argue that the trial court ruled incorrectly on several evidentiary is-sues. Although we find evidence sufficient to support the conspiracy conviction without resort to these disputed items, we discuss each briefly. We hold the trial court properly admitted against Robert McFadden coconspirator statements as well as testimony about seizure of a Corvette, clinching our conclusions in Section III.A. The trial court did not properly handle testimony of a threat made by Anthony Esparsen, but we conclude the error is harmless.

### 1. Coconspirator Statements

■ Mr. McFadden argues the jury should not have been permitted to consider certain statements by Anthony and Kelly Esparsen. We do not disturb the trial court's admission of the following testimony:

(a) Teresa Molina testified that Anthony Esparsen told her in April 1989 that he sold to five or six people and if she was the one "ratting" on him, her children would start to disappear.

(b) Detective Garcia testified that on December 2, 1988, Kelly Esparsen told him that Robert McFadden was his associate.

(c) Detective Garcia testified that on January 17 at the Chapter II Lounge Kelly Esparsen told him his buddy, McFadden, had had his new Corvette seized, and that the car had been purchased with money from cocaine sales. Kelly Esparsen also said, according to Detective Garcia, that he could deliver

---

**14.** The present situation can be distinguished from the Tenth Circuit cases cited by Mr. McFadden. In *United States v. Lopez,* 576 F.2d 840, 845 (10th Cir.1978), we held that defendant's negotiating activity, beyond mere presence and acquaintance with other conspirators, constituted participation in the conspiracy. The court stated that the case "approache[d] the outer limit of proof necessary to sustain a conspiracy conviction," so Mr. McFadden contends his case falls beyond the pale because he never directly negotiated with any of the undercover agents. However, at that time we were still operating under a framework which required proof of an overt act.

In several other cases cited by Mr. McFadden, we reversed conspiracy convictions because the evidence created only a suspicion of association with criminal activities. *United States v. Jones,* 808 F.2d 754 (10th Cir.1987) (no evidence doctor knew that physician's assistant would use job, for which doctor recommended him, to distribute controlled substances); *United States v. Austin,* 786 F.2d 986 (10th Cir.1986) (no evidence that defendant who helped negotiate purchase of ranch knew that buyers wanted to use the ranch as a landing strip to smuggle marijuana although defendant noticed airplane tracks at one point); *United States v. Dumas,* 688 F.2d 84 (10th Cir.1982) (although defendant intended to obtain a prescription drug, evidence did not establish that he knew his physician supplier obtained the drug by misrepresentation or fraud).

four or five kilos monthly prior to his friends, including Mr. McFadden, getting arrested.

Federal Rule of Evidence 801(d)(2)(E) excepts from the hearsay definition statements made "by a coconspirator of a party during the course and in furtherance of the conspiracy." A conspiracy must be established by a preponderance of the evidence which may include the statements themselves as well as independent evidence. *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). The trial court's finding of a conspiracy is factual, subject to the clearly erroneous standard of review. *United States v. Bouck*, 877 F.2d 828, 831 (10th Cir.1989).

Defendants rely on their argument that the evidence is insufficient to establish a conspiracy to assert that Rule 801(d)(2)(E) is inapplicable. However, the independent evidence as discussed in Section III.A., plus the disputed statements themselves, establish the foundation for Rule 801(d)(2)(E) beyond cavil. Defendants do not contest whether the statements were made during the course or in furtherance of the conspiracy.

### 2. Seizure of the 1988 Corvette

Mr. McFadden does not challenge the government's presentation of evidence that he purchased a 1988 Corvette in the summer of 1988 and that Kelly Esparsen helped negotiate the deal. He objects, however, to the government's questions about the seizure of the Corvette on August 26, 1988. The evidence should have been barred under Fed.R.Evid. 403, Mr. McFadden contends, because it had no relevance to the charges of drug dealing but created a prejudicial implication of illegal activities associated with the car. Reviewing the trial court's balancing of probative and prejudicial value for abuse of discretion, *United States v. Harmon*, 918 F.2d

115, 118 (10th Cir.1990), we hold there was no error in the admission of this testimony.

The disputed evidence was given by Special Agent John Slagle of the Department of Justice, Drug Enforcement Administration, who testified that on August 26, 1988, he assisted in the seizure of a 1988 Corvette. While the agents waited for the wrecker to pick up the car, Anthony Esparsen passed by and stopped. Agent Slagle testified about the exchange he had with Anthony Esparsen:

> Agent Slagle: Mr. Esparsen advised me—or asked me what we were doing, and I said that we were seizing the Corvette, that we had a seizure warrant for it. And he said, well, his lawyer would be here in a few minutes, and he tried to hand me a business card.

> Counsel: All right; did he say his lawyer?

> Agent Slagle: I don't recall the specific words. He said his lawyer or their lawyer would be there in a few minutes.

The trial court noted that the defendants themselves had testified about the purchase of the car, and the testimony was relevant to "the question of the true ownership, who actually paid for it." We also agree with the government's response that the testimony was relevant to showing a relationship between Robert McFadden and Anthony Esparsen.

### 3. Threats by Anthony Esparsen

Anthony Esparsen challenges the trial court's admission of Teresa Molina's testimony that he threatened harm to her children if she was the one "ratting" on him. Because this is evidence of an act other than the crime charged,[15] we evaluate its admissibility under Fed.R.Evid. 404(b) which governs evidence of "[o]ther crimes, wrongs, or acts." We review the trial

---

**15.** The threat occurred in April 1989, after the end of the charged conspiracy between December 1987, and February 1989. Rule 404(b) applies to both prior and subsequent conduct. *See United States v. Bonnett*, 877 F.2d 1450, 1461

(10th Cir.1989); *United States v. Wright*, 573 F.2d 681, 683 (1st Cir.1978) (testimony of threats and beating several months after charged act relevant and admissible under Rule 404(b)).

court's decision for abuse of discretion. *United States v. Record*, 873 F.2d 1363, 1373 (10th Cir.1989). Although the trial court failed to take the proper steps in admitting this evidence, it did not commit reversible error.

Rule 404(b) prohibits using evidence of other acts "to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The admissibility of such evidence is guided by the Supreme Court's decision in *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988); *Record*, 873 F.2d at 1374.[16] In *Huddleston*, the Supreme Court explained that protection from unfair prejudice of 404(b) evidence comes from (1) Rule 404(b)'s requirement that the evidence be offered for a proper purpose, (2) Rule 402's relevancy requirement, (3) Rule 403's requirement that the evidence be more probative than prejudicial, and (4) Rule 105's requirement that the trial court, upon request, instruct the jury that the evidence should only be considered for the proper purpose for which it was admitted. 485 U.S. at 691, 108 S.Ct. at 1502.

▮ Ms. Molina's testimony served the proper 404(b) purpose of showing Anthony Esparsen's knowledge of cocaine sales.[17] Assuming without deciding that the dictates of Rules 402 and 403 are also met,[18] we hold the trial court erred in denying defendants' request for a limiting instruction. For instance, the jury should have been told only to consider Anthony Esparsen's threats as proof of knowledge, not as evidence of a violent person likely to commit illegal acts. Nevertheless, the trial court's failure is harmless error because other evidence of Anthony Esparsen's involvement in drug sales was substantial. Furthermore, the prosecution did not urge any improper inferences. *See United States v. King*, 897 F.2d 911, 915 (7th Cir. 1990) (trial court's failure to give limiting instruction on use of prior convictions evidence harmless because other evidence of guilt substantial, and prosecution never suggested that jury should use prior convictions as evidence of propensity to commit crime).

### IV. Supervised Release Sentence (Anthony Esparsen)

▮ The government concedes that Anthony Esparsen's six-year period of supervised release for his conspiracy conviction exceeds the statutory maximum. Section 841(b)(1)(B), 21 U.S.C., sets forth the penalty for a conspiracy to distribute over 500 grams of cocaine, requiring at least four

---

**16.** The government seeks to evade the requirements of Rule 404(b) by claiming that the testimony is "not offered ... under Rule 404(b) but rather under the doctrine of 'consciousness of guilt'." However, the cases cited by the government do not establish such a doctrine which obviates the need to apply Rule 404(b) to evidence of acts other than the one charged. The clearest statement of the government's theory appears in *United States v. Smith*, 629 F.2d 650, 651–52 (10th Cir.), *cert. denied*, 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 291 (1980): "Evidence of threats to a prosecution witness is admissible as showing consciousness of guilt if a direct connection is established between the defendant and the threat." This aspect of *Smith* has been cited once in *United States v. Sutton*, 732 F.2d 1483, 1489 (10th Cir.1984), *cert. denied*, 469 U.S. 1157, 105 S.Ct. 903, 83 L.Ed.2d 919 (1985). In that case, the court permitted a tape recorded conversation in which defendant said his lawyer thought he was guilty because it "tended to prove motive and consciousness of guilt." The discussions in both cases were quite brief. Because matters such as motive, intent, plan, or knowledge essentially involve "consciousness of guilt," it appears the *Smith* and *Sutton* courts were implicitly applying Rule 404(b).

**17.** In *United States v. Kendall*, 766 F.2d 1426, 1436 (10th Cir.1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986), we set up stringent requirements that the government and the trial court specifically identify the purpose for which the evidence is being offered and the connection between the evidence and that purpose. More recently, however, we have held that even if the basis for admission has not been specifically articulated, the error is harmless as long as a proper purpose is apparent from the record. *Record*, 873 F.2d at 1375, n. 7.

**18.** Defendants did not challenge admission of the evidence on these grounds at trial.

years of supervised release. However, the court's sentencing power is constrained by 18 U.S.C. § 3583(b)(1) which does not permit supervised release longer than five years for this offense. We remand for resentencing.

## V. Conclusion

We reject all grounds for defendants' appeal except Anthony Esparsen's sentencing complaint. Defendants have failed to present a record which establishes a prima facie case of discriminatory use of peremptory challenges under *Batson*. The evidence sufficiently supports the jury's conviction of Mr. McFadden for aiding and abetting, and its conviction of all three defendants for conspiracy to distribute over 500 grams of cocaine. The trial court's only evidentiary error was refusing to give a limiting instruction for testimony of threats by Anthony Esparsen, but the error was harmless. Therefore, we AFFIRM the judgment of the United States District Court for the District of New Mexico. We REMAND for resentencing of Anthony Esparsen.