991 F.2d 806
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Juaquin RIVERA, Defendant-Appellant.
 No. 92-2132.
 United States Court of Appeals, Tenth Circuit.
 April 15, 1993.
 
 Before SEYMOUR, ANDERSON and EBEL, Circuit Judges.
 ORDER AND JUDGMENT*
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The cause is therefore ordered submitted without oral argument.
 
 
 2
 Juaquin Rivera was convicted after a jury trial of conspiracy to distribute more than 5 kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and sentenced to 120 months in prison, five years' supervised release, and a $50 special assessment. On appeal he contends that the district court erred when it denied his motion for a judgment of acquittal based on insufficient evidence to sustain his conviction. We affirm.
 
 I. FACTS
 
 3
 The facts, viewed from the perspective that tends to support the jury's verdict, United States v. Harrison, 942 F.2d 751, 754 (10th Cir.1991), are as follows. According to the testimony of United States Border Patrol Agent Michael Carvalho, in mid-October 1991, agents of the United States Border Patrol arrested Guillermo Lopez at a permanent Border Patrol checkpoint in Otero County, New Mexico, after they discovered 18.8 pounds of cocaine hidden in the gas tank of the Ford Thunderbird he had been driving. Appellant's App. Tab 5, at 27. Agent Carvalho further testified that Lopez admitted to the agents that he was supposed to deliver the cocaine in the gas tank to the Denver area and agreed to participate in a controlled delivery of the cocaine. Id. at 32-33.[1]
 
 
 4
 Lopez testified at trial as to how he ended up at the checkpoint with a gas tank full of cocaine. He stated that he had been "broke" and that he had told Jose Renteria that he needed some money. Id. at 72. Jose told Lopez that he had a "little job" for Lopez. Id. Lopez then testified,
 
 
 5
 He tell me they got, supposed to, that for me to drive a car to Denver but he didn't tell me exactly what the deal is. So when I get to the house he told me they got, the deal was the three kilos in the car, and I know there were three kilos in the car.
 
 
 6
 Id. According to Lopez, the conversation between Jose and him occurred at a car wash (located, apparently, in El Paso, Texas) where two other individuals were present: Francisco "Kiko" Renteria (Jose's brother) and Rivera. Id. at 68, 73. Lopez also testified, "Well, we started towards, Jose, "Kiko" and Juaquin [Rivera], and we talk about it, about the cocaine and the car that I had to deliver to Denver...." Id. at 68.[2] He also testified that "[Rivera] was there and he knew what was going to happen because he was going to meet me in Denver." Id. at 79.[3]
 
 
 7
 The time for the controlled delivery approached soon after Lopez was arrested. The agents repaired the Thunderbird and then accompanied Lopez northward to Santa Fe, where they met with Denver Drug Enforcement Administration agents. Id. at 33. The delivery apparently was to occur at a Days Inn. Id. at 94. Lopez arrived at the Days Inn and then, he testified,
 
 
 8
 A. (Lopez) I called Jose. He gave me a number in Denver, I called in Denver to the house that I needed to call.
 
 
 9
 Q. (Mr. Barth for the Government) Okay. And who answered the phone?
 
 
 10
 A. Juaquin [Rivera] answered the phone, and I asked him if I could talk to "Kiko", and he put "Kiko" on the line. And I told "Kiko" that I was now at the hotel, and I said, "What time are you going to come and pick up the car?" And the agents were recording it.
 
 
 11
 Q. Okay. What happened then?
 
 
 12
 A. Well, "Kiko" told me that he couldn't go to the hotel because things were like real hot.
 
 
 13
 Q. What did that mean?
 
 
 14
 A. That something was going on.
 
 
 15
 Q. Okay. What happened then?
 
 
 16
 A. And then, I asked him, "What is the problem? Why can't you come to the hotel?" And so that is when he told me to go the 7-11.
 
 
 17
 Id. at 94-95.
 
 
 18
 Kiko then instructed Lopez to go to a 7-11 "two blocks above the hotel." Id. at 95. Lopez did so. Id. When he arrived he saw Mr. Rivera walking toward him, and saw Kiko sitting in a beige car. Brief of Appellee at 7. Lopez apparently approached the driver's window of Kiko's car, Appellant's App. Tab 5, at 98; Brief of Appellant at 4; Brief of Appellee at 7, and then, as instructed by the DEA agents, asked Kiko how many kilos of cocaine were in the Thunderbird. Kiko responded "five kilos of cocaine." Appellant's App. Tab 5, at 98.[4] Kiko then gave Lopez $180 to pay for the hotel and food. Id. During this interchange Mr. Rivera "stay[ed] with" Lopez, and Lopez testified that when he asked Kiko how much cocaine Lopez had in his car Kiko and Rivera looked at each other and laughed. Id. The testimony of Officer Todd Gregory of the DEA, who was surveilling the 7-11 from about one hundred feet away, corroborated Lopez's testimony that Mr. Rivera "stayed with" Lopez and Kiko during the conversation. Officer Gregory stated that a conversation occurred next to the driver's window of a beige car in the 7-11 parking lot between three individuals, one of which he identified as Mr. Rivera. Id. at 172-73; Brief of Appellee at 8. Gregory testified that the conversation lasted about three to four minutes, and that Mr. Rivera never withdrew from it. Appellant's App. Tab 5, at 175. Lopez further testified that Mr. Rivera "was going to take the car with cocaine in it." Id. at 99.
 
 
 19
 Shortly after this interchange the authorities moved in and arrested Kiko and Rivera. When Mr. Rivera was arrested he was in the Thunderbird with the motor running. Brief of Appellant at 4; Brief of Appellee at 8-9.
 
 II. DISCUSSION
 
 20
 Our standard of review of a sufficiency of the evidence claim and a contention that a motion for acquittal was erroneously denied are the same: the evidence is sufficient (and denial of the motion is proper) if a reasonable jury, viewing the evidence in the light most favorable to the government and drawing reasonable inferences from the evidence, could have found the defendant guilty beyond a reasonable doubt. United States v. Harrod, 981 F.2d 1171, 1174 (10th Cir.1992) (denial of motion); United States v. Morehead, 959 F.2d 1489, 1499 (10th Cir.1992) (sufficiency claim). "We will overturn a jury's conspiracy conviction only if, after review of both direct and circumstantial evidence, we believe no reasonable jury could find defendant guilty beyond a reasonable doubt." United States v. Young, 954 F.2d 614, 618 (10th Cir.1992).
 
 
 21
 "A conspiracy conviction requires the government to prove ' " that two or more persons agreed to violate the law, that the defendant knew at least the essential objectives of the conspiracy, ... that the defendant knowingly and voluntarily became a part of it," and that the alleged coconspirators were interdependent.' " United States v. Slater, 971 F.2d 626, 630 (10th Cir.1992) (quoting United States v. Evans, 970 F.2d 663, 668 (10th Cir.1992) (quoting United States v. Fox, 902 F.2d 1508, 1514 (10th Cir.), cert. denied, 498 U.S. 874 (1990)), cert. denied, 61 U.S.L.W. 3582 (U.S. Feb. 22, 1993)). "[A]n express agreement [to distribute] is not required. A tacit agreement is sufficient." United States v. Hartsfield, 976 F.2d 1349, 1354 (10th Cir.1992), cert. denied, 61 U.S.L.W. 3583 (U.S. Feb. 22, 1993). " '[T]he jury may presume that a defendant is a knowing participant in the conspiracy when he acts in furtherance of the objective of the conspiracy.' " Morehead, 959 F.2d at 1500 (quoting United States v. Brown, 943 F.2d 1246, 1250 (10th Cir.1991)). Indeed, an agreement to distribute drugs can sometimes "rationally be inferred" from "frequent contacts" among the defendants and from "their joint appearances at transactions and negotiations." United States v. Esparsen, 930 F.2d 1461, 1472 (10th Cir.1991), cert. denied, 112 S.Ct. 882 (1992).
 
 
 22
 However, "the evidence from which a defendant's knowledge of the essential objectives of the conspiracy may be inferred must be 'clear and unequivocal.' " Morehead, 959 F.2d at 1500 (quoting United States v. Austin, 786 F.2d 986, 988 (10th Cir.1986)). Thus, "[m]ere presence" at the scene of a crime does not, by itself, prove involvement in an existing conspiracy, although it is a "material factor." United States v. Hamlin, 1993 WL 36307 at * 3 (10th Cir.1993) (citing Esparsen, 930 F.2d at 1472). It is " ' "essential to determine what kind of agreement existed as to each defendant." ' ... The best way to assess a defendant's intended involvement in a conspiracy is to examine the conspiracy from that defendant's point of view. What exactly did [the defendant] think [he] was joining?" Evans, 970 F.2d at 673-74 (quoting United States v. Record, 873 F.2d 1363, 1368 (10th Cir.1989) (quoting United States v. Borelli, 336 F.2d 376, 384 (2d Cir.1964), cert. denied, 379 U.S. 960 (1965))).
 
 
 23
 Mr. Rivera contends that he did not knowingly become a part of a conspiracy to distribute cocaine. In support of his contention Rivera cites his own testimony at trial, in which he stated that his relationship with Kiko Renteria was that of an innocent runner and handyman. Appellant's App. Tab 5, at 197-199. He stated that beginning sometime in September he would go to Mexico to deliver medicine and cars to Kiko's ranch in Chihuahua. Id. He testified that Kiko would at times help him in these tasks in order to expedite border paperwork, id. at 198-99, and that the reason that Kiko and he travelled to Denver at the time of the cocaine delivery was to pick up a horse trailer. Id. at 210. He disavowed having participated in any conversations with Lopez. Id. He also testified that he heard no mention of the word "cocaine" at the 7-11. Id. at 221. He also argues that the government failed to prove directly that he had knowledge of the existence of cocaine or that he was a willing participant in a conspiracy to possess cocaine with intent to distribute. Brief of Appellant at 10-11.
 
 
 24
 There is sufficient evidence to sustain a reasonable jury's finding of guilty in this case. Lopez, a coconspirator, testified that Mr. Rivera knew about the cocaine delivery at the time it was formulated, and answered the telephone when Lopez made the call to announce his arrival at the Days Inn. He also testified that Mr. Rivera was present while the actual delivery was executed, and that Mr. Rivera laughed when the subject of how much cocaine was in the delivery was broached.[5] Rivera's presence and his conduct while present are consistent with Lopez's testimony. See Hamlin, 1993 WL 36307 (evidence was sufficient to convict defendant who accompanied conspirators to delivery site, was described to undercover agent by conspirators as knowledgeable about drugs and a "cook," and who said that barrel containing precursor chemical "smelled good" and helped load it into car); see also Esparsen, 930 F.2d at 1472. Furthermore, Lopez's testimony about what happened at the 7-11 was corroborated by Officer Gregory's testimony of his observations during surveillance of the delivery.
 
 
 25
 Mr. Rivera attempts to impeach Lopez's testimony through contradiction, but "the question of credibility of witnesses ... is one for the jury...."[6] United States v. Pace, 981 F.2d 1123, 1135 (10th Cir.1992) (while informant's testimony contradicted that of officers, evidence was still sufficient to support conspiracy conviction), cert. denied, 61 U.S.L.W. 3600 (U.S. March 1, 1993); see United States v. LeRoy, 944 F.2d 787, 790 (10th Cir.1991) (jury found informant's testimony credible, and it was corroborated by surveilling officers), cert. denied, 112 S.Ct. 903 (1992); see also United States v. Cox, 934 F.2d 1114, 1121 (10th Cir.1991) ("[A] jury may convict based on the uncorroborated testimony of a co-conspirator."). Furthermore, the testimony of coconspirators and/or informants such as Lopez sheds light on the conspiratorial nature of activities that would otherwise appear to be innocuous. Such testimony has been useful, and even dispositive, in other cases. See, e.g., United States v. Nicholson, 983 F.2d 983, 989-90 (10th Cir.1993) (drugs in defendant's car and defendant's visit to conspiracy member's house, in combination with testimony of three drug purchasers that defendant sold them drugs, was sufficient to uphold conspiracy conviction); United States v. Richard, 969 F.2d 849, 856-57 (10th Cir.1992) (presence at scene of crime was insufficient by itself to sustain conviction, but in conjunction with unusual facts that as circumstantial evidence "require[d] some explanation" and testimony of detective posing as drug informer, evidence was sufficient to uphold conspiracy conviction); United States v. Soria, 959 F.2d 855, 857-58 (10th Cir.), cert. denied, 113 S.Ct. 236 (1992); United States v. Cox, 934 F.2d at 1120-21; cf. United States v. Anderson, 981 F.2d 1560 (10th Cir.1992) (evidence insufficient to sustain conspiracy conviction when no conspiracy member or informant testified as to defendant's involvement in conspiracy).
 
 
 26
 Accordingly, for the reasons stated above, we AFFIRM the district court's denial of Rivera's motion for judgment of acquittal, and AFFIRM the conviction.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 According to Agent Carvalho's testimony, a "controlled delivery" is a drug delivery in which at least one government agent or informant is a participant. Appellant's App. Tab 5, at 32
 
 
 [2]
 Mr. Rivera argues that the following testimony by Lopez on direct examination shows that Lopez did not ever discuss cocaine with Mr. Rivera and that Rivera was not present when cocaine was mentioned: "I didn't exactly have a specific conversation with [Rivera] about cocaine...." Appellant's App. Tab 5, at 79. At best this statement is equivocal, but any inconsistency was for the jury to sort out, and under our standard of review we must view Lopez's testimony in the light most favorable to the government
 
 
 [3]
 Lopez testified that while the task of driving a car to Denver was first mentioned at the car wash, the details of "the deal"--that it was a cocaine drop--were not revealed until Lopez was at "the house". Appellant's App. Tab 5, at 72. The record (only a partial transcript was submitted on appeal) does not reveal what "house" this was, nor when the conversation resumed at this "house." Consequently, it is unclear whether Lopez's testimony that Rivera "was there" meant that Rivera "was there" at the car wash or "was there" during the conversation at "the house" when cocaine was first mentioned, or both. However, it is the content of the conversation, not where it took place, which is important
 
 
 [4]
 The government notes in its brief that an error was made in the transcription of the trial, and that the phrase "had had kilos of cocaine" (as it appears in the official transcript) should read "had five kilos of cocaine." Brief of Appellee at 7 n. 1; see Appellant's App. at 98. The government also claims Rivera's trial counsel acknowledges the error. Brief of Appellee at 7 n. 1. While we have no independent corroboration of the government's contention, it is of no significance, since no material contested issues turn on the use of "five" over "had."
 
 
 [5]
 In his brief Mr. Rivera suggests that he laughed only because the thought of carrying cocaine was ludicrous, Brief of Appellant at 8, but a more inculpating inference is not only possible from the face of the record, it is probable
 
 
 [6]
 In any event, Mr. Rivera's attempts to impeach Lopez's testimony are ill-conceived. Lopez was the only government witness to testify both as to Mr. Rivera's presence at all the various conversations and Mr. Rivera's knowledge of the content of those conversations. Mr. Rivera concedes that Lopez's testimony is credible as to presence, but not as to knowledge. This inconsistency seriously erodes Rivera's attack on Lopez's credibility