UNITED STATES of America, Plaintiff,

v.

Carlos SALAZAR, Defendant.

No. 92 C 933 (89 CR 998).

United States District Court,
N.D. Illinois, E.D.

Feb. 13, 1992.

Al Grossman, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

William Hedrick, Skokie, Ill., for defendant.

MEMORANDUM OPINION
AND ORDER

SHADUR, District Judge.

Carlos Salazar ("Salazar") has submitted a motion under 28 U.S.C. § 2255 ("Section 2255") in which he seeks to have this Court correct a portion of the sentence that it imposed on him just over a year ago (on January 28, 1991) in Case No. 89 CR 998. But because this Court has determined that the Sentencing Guideline ("Guideline") provision on which Salazar seeks to rely is in conflict with the controlling provisions of the statute under which he was sentenced, this Court dismisses the motion summarily as permitted under Rule 4(b) of the Rules Governing Proceedings in the United States District Courts under Section 2255 of Title 28, United States Code ("Section 2255 Rules").

Salazar's motion confirms that he is not questioning the custodial sentence that this Court imposed on him (75 months in the custody of the Attorney General). Instead he attacks what he characterizes as "the illegal and improper length of the supervised release" term of eight years that was pronounced by this Court to follow his release from imprisonment. Salazar attaches to his motion a photocopy of Guideline § 5D1.2, which he characterizes as limiting a supervised release term to a maximum of five years.

This Court certainly intends no criticism of Salazar for that reading—it accurately reflects the literal language of the Guideline, and it is also true that the Guidelines and their interaction with the applicable statutes are highly complex and require careful and continuous study by the lawyers and judges who deal with them regularly, so that a layman's insistence on a literal reading is more than merely understandable. What Guideline § 5D1.2(a) actually says is this (emphasis has been added to call Salazar's attention to the portion that cannot reasonably be squared with the controlling statutes in narcotics cases such as this one):

If a defendant is convicted under a statute that requires a term of supervised release, *the term shall be* at least three

years but not more than five years, or *the minimum period required by statute, whichever is greater.*

Salazar pleaded guilty to a charge of possession with intent to distribute a quantity of cocaine that was just a few grams under 3 kilograms, in violation of 21 U.S.C. § 841(a)(1).[1] Because that offense involved more than 500 grams but less than 5 kilograms of cocaine, the sentence prescribed for its violation (both in terms of custody and then by way of supervised release) is defined in Section 841(b)(1)(B). After it specifies a term of imprisonment of not less than 5 years for such an offense (absent a prior felony conviction in a drug case [2]), Section 841(b)(1)(B) goes on to state:

> Any sentence imposed under this subparagraph shall, in the absence of such a prior conviction, include a term of supervised release of at least 4 years in addition to such term of imprisonment and shall, if there was such a prior conviction, include a term of supervised release of at least 8 years in addition to such term of imprisonment.[3]

It is quite true that if read literally to focus only on the *minimum* supervised release period specified by statute (4 years or 8 years in the just-quoted sentence), Guideline § 5D1.2(a) would permit *no more than* an 8-year supervised release term for the repeat narcotics offender (as well as permitting no more than 5 years for a first offender such as Salazar). But such a reading would make 8 years both the minimum *and* the maximum supervised release term for such a repeat narcotics offender, thus wiping out any prospect of judicial compliance with the explicit congressional grant of authority to impose a greater su-

pervised release sentence. That would render entirely meaningless the congressional provision for *at least* 8 years of supervised release in the repeat offender situation—and of course the Sentencing Commission cannot override the express will of the Congress that gave it life in the first place.

This Court is aware of two Court of Appeals' decisions that have touched upon somewhat related issues. *United States v. Esparsen*, 930 F.2d 1461, 1476–77 (10th Cir.1991) invalidated a 6-year supervised release term that had been imposed by a District Judge under the Section 841(b)(1)(B) provision that requires (as well as authorizes) "at least 4 years" of supervised release. But the court's decision there was based upon its mistaken view that 18 U.S.C. § 3583(b)(1) ("Section 3583(b)(1)") "does not permit supervised release longer than 5 years for this offense" (*id.* at 1477). As has been pointed out more recently in *United States v. LeMay*, 952 F.2d 995, 997–98 (8th Cir.1991) (per curiam), that *Esparsen* holding had simply missed the existence and effect of the amendment to Section 3583(b) that was enacted contemporaneously with the lengthened supervised release terms permitted in Section 841(b)(1), thus eliminating the conflict that the *Esparsen* court had mistakenly identified.

As for *LeMay* itself, after having decided that the *statute* expressly permitted the 10-year supervised release term that the district court there had imposed pursuant to a plea agreement, the Court of Appeals for the Eighth Circuit went on to consider LeMay's argument that 10 years of supervised release was an illegal sentence under Guideline § 5D1.2(a). Because LeMay was

---

1. Further citations to subsections of that statute will simply take the form "Section 841—."

2. In the course of sentencing Salazar, this Court upheld his lawyer's contention that Salazar's previous state court conviction for possession of cocaine was invalid because his guilty plea in that earlier case had been constitutionally deficient. Thus this Court treated Salazar as a first offender, rather than as a second offender, for sentencing purposes under the statute just referred to (and quoted in part) in the text.

3. [Footnote by this Court] Other subsections of Section 841 pose the same problem that is identified in the discussion that follows in the text of this opinion. Thus where the quantity of cocaine involved is more than 5 kilograms, Section 841(b)(1)(A) mandates a supervised release term "of at least 5 years" for a first narcotics offender and "of at least 10 years" for a repeat narcotics offender. Even where a lesser quantity of cocaine is involved, Section 841(b)(1)(C) requires a supervised release term "of at least 6 years" for any defendant with a prior drug conviction.

a first offender, Section 841(b)(1)(A) required the imposition of a supervised release term "of at least 5 years." LeMay's argument as to the claimed illegality of a 10–year term (which by definition constitutes "at least 5 years") was rejected, based on the court's determination that the Guideline provision for supervised release established a *range* of 3 to 5 years that was subject to the same types of departures as those that apply to the ranges of imprisonment that have been created by the Guidelines.

With all respect, that strikes this Court as an overly generous treatment of the Guideline in question. As said earlier in this opinion, when Congress has decreed that a sentencing judge has the power to impose a sentence of *at least* a specified number of years, the Sentencing Commission should not be permitted to arrogate to itself a veto of that congressionally prescribed power by converting the specified number of years into a ceiling as well as a floor (which is the literal effect of Guideline § 5D1.2(a)).

What that means to this Court is that Guideline § 5D1.2(a) should not be understood in its literal sense (or that if it is so understood, it must be held to be invalid). For the repeat offender, the statutory provision for "a term of supervised release of at least 8 years in addition to such term of imprisonment" must be taken to permit—as it has consistently been viewed, to this Court's knowledge, by sentencing judges [4]—a supervised release term for any period up to and including life. And if that is so, the corresponding language for first offenders of "a term of supervised release of at least 4 years in addition to such term of imprisonment" must be read by parity of reasoning in the same manner.[5]

This Court therefore concludes that "it plainly appears from the face of the motion . . . and the prior proceedings in the case that the movant is not entitled to relief in the district court" (Section 2255 Rule 4(b)), and Salazar's motion is dismissed summarily. As provided in Rule 4(b), this Court is contemporaneously causing Salazar to be notified of this dismissal.

**4.** For whatever it is worth, the Probation Office in this District has also treated the statutory prescription of "at least 4 years" as meaning "4 years to life," despite the language of Guideline § 5D1.2(a). And that office's check with the national resource center for information to probation officers on Guideline questions has produced an identical reading.

**5.** In this case it is worth observing that if Salazar's situation were to be viewed through the lens prescribed by *LeMay*, in which the longer supervised release term that was imposed by this Court would be perceived as an upward departure, there would be ample justification for approving such a departure. Even though this Court was required to (and did) invalidate Salazar's prior state court drug conviction because of what this Court found had been the absence of a knowing waiver of his constitutional rights in that earlier case, the fact is that Salazar had acknowledged his drug-related activity on that earlier occasion. That admitted *conduct* can be considered as a factor in support of an upward departure. In addition, this Court found persuasive for sentencing purposes this portion of the Probation Officer's evaluation as reflected in Salazar's presentence investigation report:

Carlos Melan Salazar is a 31–year–old man who has been convicted of possession with intent to distribute 2,963.6 grams of co-

caine. . . . After some discussion about the offense, Mr. Salazar admitted his guilt and some remorse regarding his criminal behavior. However, this writer believes that during the discussion, Mr. Salazar purposely tried to downplay his role in the offense and convoluted his version so that it was quite difficult to understand. Further, based on the government's version, it appears that the defendant had a key role in the offense. This writer certainly does not believe that this was the defendant's first involvement with drugs as he reported, and this is certainly contraindicated by his prior drug conviction. Also, a great deal of drugs and money was involved in this offense, and it is unlikely that this would be a person's first dabble in the drug trade. Finally, the government's version of the offense (a copy of which is attached) also buttressed this Court's determination that it was important to keep a long-term constraint on Salazar so that any repetition of drug activity on his part could be dealt with as a violation of the terms of supervised release. For those reasons this Court considered then, and it continues to consider, that the longer supervised release term that it imposed was a proper exercise of the authority conferred by Section 841(b)(1)(B).

APPENDIX

Memorandum

Subject

Government's Version

*United States v. Carlos Salazar*, 89 CR 998

Date

December 4, 1990

To

Therese Fitzpatrick

Probation Officer

From

Alan Grossman

AUSA

On November 29, 1989, CARLOS SALAZAR delivered approximately 2,963.6 grams of cocaine (81%) pure) to an undercover Illinois State Police Officer. The events leading up to that transaction are described below.

On Friday, November 24, 1989, at approximately 3:50 p.m, the undercover agent received a page on his pager indicating to call telephone number 384–9345 with the code number 11 following it. The undercover agent placed a call to the number and had a conversation with CARLOS J. SALAZAR. During the conversation, SALAZAR told the undercover agent that he (SALAZAR) had three (3) "girls" (kilograms of cocaine) left and asked if the undercover agent wanted to purchase them. SALAZAR said that he (SALAZAR) originally had nine (9) kilos of cocaine but had sold six (6) kilos and had the three (3) left which he (SALAZAR) would sell to the undercover agent for $22,500.00 each. The undercover agent told SALAZAR that the undercover agent's partner would be out of town until Sunday and asked if SALAZAR could save the cocaine until the undercover agent's partner returned. SALAZAR said that he (SALAZAR) would contact the undercover agent on Monday and tell the undercover agent if the cocaine was still available. SALAZAR said that he (SALAZAR) usually gets in fifteen (15) kilos of cocaine per week and that he (SALAZAR) would have the cocaine for the undercover agent. The undercover agent told SALAZAR that the undercover agent would want to purchase four (4) kilos of cocaine if SALAZAR could reduce the price. SALAZAR agreed to reduce the price to $22,300.00 per kilo. The undercover agent agreed to the price and it was agreed that SALAZAR would page the undercover agent on Monday. Subsequently the telephone conversation was concluded.

On Tuesday, November 28, 1989, at approximately 10:45 a.m. the undercover agent received a page on his pager indicating to call telephone number 465–9252 with the code number 11 following it. The undercover agent called the telephone number and had a telephone conversation with CARLOS SALAZAR. During the conversation, SALAZAR told the undercover agent that he (SALAZAR) was "ready" and had eleven (11) "girls" (kilograms of cocaine). The undercover agent asked SALAZAR what the price would be. SALAZAR told the undercover agent that each would cost $22,500.00. SALAZAR asked if the undercover agent wanted all the cocaine. The undercover agent declined stating the undercover agent only had enough money to purchase three or four kilos. The undercover agent then negotiated the price with SALAZAR, and SALAZAR agreed to sell each kilo of cocaine for $22,300.00. The undercover agent agreed to page SALAZAR after the undercover agent spoke to the undercover agent's partner and then the undercover agent would tell SALAZAR whether the undercover agent would want three or four kilos. The undercover agent and SALAZAR subsequently concluded the telephone conversation.

At approximately 1:50 p.m., the undercover agent placed a telephone page to SALAZAR via SALAZAR's pager number 812–8727. Shortly thereafter the undercover agent received a return call from SALAZAR. During the telephone conversation, the undercover agent asked if SALAZAR had the four (4) kilos of cocaine which the undercover agent wanted to purchase. SALAZAR said that he (SALAZAR) had eleven (11) kilos and expected ten (10) more that day. The undercover agent said that he wanted to purchase the cocaine the

following day but wanted to meet and discuss the transaction with SALAZAR first. The undercover agent and SALAZAR agreed to meet in the area of Cicero and North Avenue in Chicago, Illinois at approximately 4:00 p.m. SALAZAR told the undercover agent to call him (SALAZAR) after arriving in the area. The undercover agent agreed and the telephone conversation was concluded.

At approximately 4:00 PM, the undercover agent and his partner arrived and parked in the eastern portion of the Burger King restaurant and awaited the arrival of SALAZAR. At approximately 4:50 PM, the undercover agent observed CARLOS SALAZAR arrive in a black 1982 Toyota Supra, license applied for, and park next to the passenger side of the undercover vehicle. Also in the Supra was an unknown female/Hispanic. SALAZAR exited from the Toyota and walked to the passenger side of the undercover vehicle. The undercover agent's partner exited from the undercover vehicle and sat in the rear passenger area. SALAZAR entered the front passenger area after which the undercover agent introduced his partner to SALAZAR. After brief greetings between the parties, the undercover agent told SALAZAR that the undercover agent wanted a "couple" (two kilos of cocaine) and that his partner also wanted a "couple". The undercover agent reconfirmed the price of each kilo of cocaine as being $22,300.00 and the undercover agent wanted 4 kilos. SALAZAR agreed on the price and said that he (SALAZAR) had the cocaine, and in fact had eleven kilos and expected to receive ten more kilos that day. SALAZAR assured the undercover agent that the cocaine was of good quality and were in the original packages the way they came from Colombia.

The undercover agent and SALAZAR negotiated on how and where the transaction would take place. The undercover agent told SALAZAR that the undercover agent preferred to purchase the cocaine at some place such as a Burger King restaurant. SALAZAR suggested coming to his (SALAZAR's) house stating that the cocaine was

in the basement. The undercover agent declined going to SALAZAR's house. SALAZAR said that his (SALAZAR's) friend lost 3 kilos of cocaine recently and that was why SALAZAR was being cautious and didn't want to bring the cocaine out to the street. SALAZAR finally agreed to meet the undercover agent at the Burger King in the area of Kedzie and Lawrence at approximately 1:30 p.m. the following afternoon. SALAZAR said he (SALAZAR) preferred for the undercover agent to go to his (SALAZAR's) residence because he (SALAZAR) had a money counting machine there. The undercover agent again declined. SALAZAR agreed to meet at the Burger King and have the cocaine in his (SALAZAR's) car. The conversation continued and SALAZAR said that his (SALAZAR's) source gives him (SALAZAR) the cocaine on credit and SALAZAR sells it and gives the source the money. SALAZAR said that the cocaine comes from California and he (SALAZAR) got 15 kilos two days earlier from the source but only sold 6 kilos. SALAZAR added that he (SALAZAR) got 10 more kilos from the source but SALAZAR told the source to wait until SALAZAR had sold the original cocaine. SALAZAR told the undercover agent that the source flies to California and drives the cocaine back in a rental car. SALAZAR told the undercover agent that the source brings 15 kilos in every Tuesday or Wednesday. SALAZAR said that he (SALAZAR) used to sell the cocaine for $17,500.00 but now charges $21,500.00 to $22,000.00.

Subsequently the meeting ended and the undercover agent and his partner parted company with SALAZAR. SALAZAR exited the undercover vehicle and returned to the Toyota and departed. The undercover agent and his partner also departed and proceeded to the meet location.

On Wednesday, November 29, 1989, at approximately 11:05 a.m., the undercover agent placed a telephone page to SALAZAR via SALAZAR's pager, number 812–8707. Shortly thereafter the undercover agent received a return call from SALAZAR. During the conversation the undercover agent told SALAZAR that the undercover agent and the undercover agent's partner were ready and asked if SALAZAR

was ready. SALAZAR assured the undercover agent that he (SALAZAR) was ready too. The undercover agent told SALAZAR that the undercover agent had all one hundred dollar bills. SALAZAR said it was alright for hundred dollar bills. The undercover agent and SALAZAR agreed to meet at the Burger King located at Lawrence and Kimball in Chicago, Illinois approximately 1:30 p.m. SALAZAR said that he would be alone and have the cocaine with him in his car. SALAZAR told the undercover agent to call him before the undercover agent left to meet. Subsequently the telephone conversation was concluded.

At approximately 1:15 p.m., the undercover agent departed in his vehicle followed by his partner in his vehicle, and proceeded to the area of the Burger King restaurant located at 4700 North Kimball in Chicago, Illinois.

At approximately 1:30 p.m., the undercover agent arrived and parked in the western portion of the Burger King parking lot. The undercover agent partner parked on Kimball, south of the Burger King. The undercover agent exited his vehicle and entered the restaurant to see if SALAZAR had arrived yet. Upon entering the restaurant, the undercover agent was unable to locate SALAZAR. The undercover agent subsequently exited from the restaurant and returned to the undercover vehicle to await the arrival of SALAZAR. While waiting in the undercover vehicle, the undercover agent placed a telephone call to SALAZAR's pager number 812–8727, from the undercover agent's cellular car telephone. A short time later the undercover agent received a return call from SALAZAR. SALAZAR told the undercover agent that he (SALAZAR) would be at the Burger King in approximately ten (10) minutes and would be driving his (SALAZAR'S) black Toyota Supra.

At approximately 1:55 p.m, the undercover agent observed SALAZAR arrive in the black 1982 Toyota Supra. SALAZAR parked the Toyota Supra behind the undercover agent's vehicle and exited it. The undercover agent also exited his vehicle and met with SALAZAR near the rear of the undercover vehicle. During the meeting and conversation, the undercover agent asked if SALAZAR had "it" (referring to four (4) kilos of cocaine). SALAZAR told the undercover agent that he (SALAZAR) had the cocaine, but would have to go to another location to get it. The undercover agent declined saying that the Burger King was the previously agreed upon delivery location. SALAZAR said that he (SALAZAR) lived in the area and there were too many police around. The undercover agent told SALAZAR that the undercover agent's partner had the money and the undercover agent would have to page the undercover agent's partner to bring the money to SALAZAR. SALAZAR told the undercover agent that he (SALAZAR) had the cocaine in a blue car located approximately ten (10) minutes away. SALAZAR then suggested doing the transaction in a car wash nearby. The undercover agent declined once again. SALAZAR finally agreed to go obtain the cocaine from the area of Peterson Avenue and return with it. Subsequently, SALAZAR departed in the Toyota Supra and drove northbound on Kimball from the Burger King. The undercover agent returned to the undercover vehicle and awaited the return of SALAZAR.

The undercover agent waited approximately ninety (90) minutes for SALAZAR to return. During that time, the undercover agent attempted to locate SALAZAR by placing a number of telephone calls to SALAZAR's pager.

At approximately 3:10 p.m., the undercover agent received a return call from SALAZAR. SALAZAR told the undercover agent that when he (SALAZAR) left the Burger King, he (SALAZAR) had been followed by unknown cars believed by SALAZAR to be the police. SALAZAR said that he (SALAZAR) would not bring the cocaine back to the Burger King. The undercover agent and SALAZAR agreed to meet in the area of Montrose and Western at approximately 3:30 p.m., to discuss the transaction further. The undercover agent notified the surveillance agents and undercover partner of the change in location, after which all

parties proceeded to the area of Montrose and Western.

At approximately 3:30 p.m., the undercover agent and his partner arrived in the area of Montrose and Western. The undercover agent parked his vehicle on the east side of Western, north of Montrose. The undercover partner parked behind the undercover agent's vehicle, and exited his vehicle, and entered the undercover agent's vehicle.

At approximately 3:40 p.m., the undercover agent observed SALAZAR and a female/white, later identified as CINDY SPANTON, drive south on Western. The undercover agent waved from the undercover vehicle towards the Toyota Supra. Subsequently, the Toyota Supra, driven by SALAZAR, turned around and stopped next to the undercover agent's vehicle. The undercover agent and SALAZAR began a conversation, with SALAZAR telling the undercover agent about being followed. The undercover agent told SALAZAR to park and come back and talk to the undercover agent. SALAZAR parked the car a short distance in front of the undercover vehicle and SALAZAR exited it and walked back to the undercover vehicle. Spanton also exited from the Toyota Supra and remained near it. When SALAZAR arrived at the undercover vehicle, the undercover agent's partner entered the rear passenger area and SALAZAR sat in the front passenger area. SALAZAR told the undercover agent about the cars that followed him (SALAZAR). The undercover agent told SALAZAR that the undercover agent and his partner had the $88,000.00, after which undercover partner showed SALAZAR the money. The undercover agent asked if SALAZAR had the four (4) kilos of cocaine. SALAZAR said that he (SALAZAR) had the four (4) kilos, but that they were at his (SALAZAR's) house. SALAZAR expressed concern, stating that he (SALAZAR) was on probation and could go to jail for twelve (12) years. The undercover agent assured SALAZAR that there would be no problem with the undercover agent and his partner. SALAZAR insisted upon doing the transaction at his (SALAZAR's) house which SALAZAR said was several blocks away on Wolcott. The undercover agent subsequently agreed to go to SALAZAR'S house, but refused to enter it and said that SALAZAR would have to bring the cocaine out to the undercover agent's vehicle. SALAZAR agreed and said his (SALAZAR's) wife (Spanton) would wait with the undercover agent outside of SALAZAR's house. The negotiations continued and SALAZAR called Spanton to the undercover vehicle to count the money. Spanton refused to enter the vehicle and walked a short distance away. SALAZAR met briefly with Spanton, after which Spanton entered the Toyota Supra and departed enroute to 4441 North Wolcott. SALAZAR remained with the undercover agent and his partner in the undercover vehicle where SALAZAR counted $10,000.00 of the money. It was agreed that the undercover agent and SALAZAR would drive to SALAZAR's residence and the undercover partner would follow and park a short distance away. SALAZAR was to enter the residence and return with the four (4) kilos of cocaine, at which time, the undercover agent would examine the cocaine and signal for the undercover partner to bring the money to the undercover agent's vehicle. The undercover partner exited the undercover vehicle with the money and returned to his vehicle.

At approximately 3:55 p.m, the undercover agent and SALAZAR departed in the undercover agent's vehicle and proceeded to the area of Wolcott and Sunnyside followed by the undercover agent's partner.

At approximately 4:00 p.m., the undercover agent and SALAZAR arrived and parked on the west side of Wolcott, just south of Sunnyside. SALAZAR said that he (SALAZAR) would go in and get the cocaine and bring it out. SALAZAR told the undercover agent to drive and double park in front of his (SALAZAR'S) apartment once he (SALAZAR) exited it with the cocaine. Prior to exiting the undercover vehicle, SALAZAR placed a telephone call from the undercover agent's car telephone to an unknown male/Latin named Carlos LNU. The conversation was in Spanish,

but SALAZAR told the undercover agent that Carlos LNU was involved with the transaction. SALAZAR exited from the undercover vehicle and entered the apartment building at 4441 North Wolcott. The undercover agent remained in the undercover vehicle.

At approximately 4:20 p.m., the undercover agent observed the Toyota Supra, driven by Spanton, with SALAZAR in the passenger side, arrive next to the undercover agent's vehicle. SALAZAR told the undercover agent to follow, but the undercover agent refused to move. Subsequently a blue colored compact vehicle which contained two male/Latins stopped briefly next to the Toyota Supra. SALAZAR spoke in Spanish to the Latin occupants, after which the blue compact vehicle departed. SALAZAR told the undercover agent that he (SALAZAR) had the cocaine and to go into the alley. The undercover agent agreed to park near the entrance of the alley. Spanton drove the Toyota Supra into the alley east of 4441 North Wolcott. The undercover agent followed and parked a short distance to the north of where the Toyota Supra parked. The undercover agent attempted to have SALAZAR bring the cocaine to the undercover vehicle, but SALAZAR refused. The undercover agent exited the undercover vehicle and walked to the Toyota Supra. SALAZAR and Spanton exited from the Toyota Supra and Spanton said that she (Spanton) was going into the apartment. Spanton then left. SALAZAR and the undercover agent entered the Toyota Supra with the undercover agent on the passenger side and SALAZAR on the driver's side. The undercover agent asked if SALAZAR had the cocaine. SALAZAR said that he (SALAZAR) had "three" (three kilos of cocaine) instead of the previously agreed upon four (4) kilos of cocaine and handed the undercover agent a tan leather bag, which contained three (3) separate kilo packages of purported cocaine, each wrapped with tan colored tape. SALAZAR opened the leather bag and lifted out one (1) of the kilo packages of cocaine and handed it to the undercover agent. The undercover agent cut open the package and removed a small portion of the chunky white powder and field tested it with a Cobalt Thiocyanate Reagent which showed a positive reaction for the possible presence of cocaine. Subsequently, the undercover agent gave the pre-arranged arrest signal, after which the surveillance agents arrived and placed SALAZAR under arrest.

The laboratory later determined that the packages of white powder delivered by SALAZAR contained mixtures consisting of 81% cocaine. The total net weight of the mixtures was 2,963.6 grams.