UNITED STATES of America, Appellee,

v.

Johnny ENG, Defendant–Appellant.

No. 229, Docket 93–1197.

United States Court of Appeals, Second Circuit.

Argued Oct. 15, 1993.

Decided Jan. 14, 1994.

---

# 166

John L. Pollock, New York City (Susan C. Wolfe, Hoffman & Pollock, on the brief), for defendant-appellant.

Catherine E. Palmer, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty., Susan Corkery, Asst. U.S. Atty., Brooklyn, NY & Karen Patton Seymour, Asst. U.S. Atty., New York City, on the brief), for appellee.

Before: NEWMAN, Chief Judge, KEARSE, Circuit Judge, and TENNEY,* District Judge.

JON O. NEWMAN, Chief Judge:

This appeal primarily concerns the authorized terms of supervised release for those convicted of drug offenses. The general statute establishing supervised release terms provides that for Class A and Class B felonies, the maximum supervised release term is five years. 18 U.S.C. § 3583(b) (1988). However, the statute establishing drug offense penalties provides that, for offenses above stated minimum quantities, a sentence must include a term of supervised release of at least five years, implying that a longer term is permissible. 21 U.S.C. § 841(b)(1)(A) (1988). Johnny Eng appeals from the March 18, 1993, judgment of the District Court for the Eastern District of New York (Reena Raggi, Judge) convicting him of drug offenses and imposing a sentence that includes a lifetime term of supervised

---

* The Honorable Charles H. Tenney of the United States District Court for the Southern District of New York, sitting by designation.

release. We conclude that Congress intended the sentencing authority granted in section 841(b)(1)(A) to override the limitations in section 3583(b), at least in cases such as Eng's, reject Eng's other contentions, and therefore affirm.

## Background

The Government charged Eng with running a heroin trafficking operation that imported heroin from Hong Kong for distribution in the United States from 1987 to 1988. The evidence showed that Eng employed three different methods to import the drugs—possession by couriers who flew into John F. Kennedy International Airport, packaging in parcels mailed from Hong Kong, and concealment inside a bean sprout washing machine imported from Hong Kong.

In early 1987, Eng paid Wah Tom Lee $50,000 for each of six shipments of heroin that she picked up from couriers traveling through Kennedy Airport. The total amount of heroin delivered through this method was 66 kilograms. The bean sprout washing machine was used to conceal 78 kilograms of heroin sent from Hong Kong. Though Eng was acquitted of the charges related to the washing machine importation scheme, the 78 kilograms of heroin were considered by the Judge at sentencing.

The details of the mail package smuggling scheme are pertinent to the evidentiary issue in this case. Sometime in mid–1987, Eng asked Wah Tom Lee and Michael Yu to recruit individuals to receive drugs sent in parcels from Hong Kong. Yu and Lee procured the names of three individuals, Tina Wong, Cathy Leung, and a woman known as Helen (or "Ah Ling"), who were willing to receive the packages in return for $20,000 apiece. After Wong received the first parcel, Eng instructed Yu and Lee to go to Wong's apartment to inspect it. They found that the parcel contained stuffed animals, peppers, and numerous tea boxes. The tea boxes contained seven kilograms of heroin. Several days later, Eng instructed Lee to deliver the heroin to him near a bakery in New York City's Chinatown. At Lee's instruction, Wong brought the heroin to a meeting place near the bakery, met Lee and Eng there,

and then transferred the package to Eng. Eng paid Lee and Yu $50,000, of which $20,000 was given to Wong.

A week later, Eng called Lee to inform her that a second parcel would arrive soon. Lee, in turn, called Tina Wong, who notified Cathy Leung. After receiving the package, Leung took it to Wong's apartment. Wong examined its contents and informed Lee how much heroin it contained. Lee called Eng to confirm the delivery. Eng instructed her to leave the heroin in Wong's apartment. Later, at a party at his house, Eng asked Lee to deliver the parcel to someone named "Lap." Lee arranged for Wong to deliver the heroin to Lap the following day. Eng again gave Lee and Yu $50,000 for the delivery, and Lee in turn gave $20,000 to Leung and $10,000 to Wong.

Following the second delivery, Lee and Yu accompanied Eng to Hong Kong at Eng's expense. Eng introduced Lee and Yu to "Ming," the person who was sending the heroin parcels, and told Ming to contact Yu and Lee if he was not available. Lee provided Eng with a list of four more people willing to receive packages.

Shortly after the group returned from Hong Kong, four more packages were delivered, each containing seven kilograms of heroin. The third parcel was delivered to Cathy Leung's residence. With Eng's permission, Lee sold a portion of the heroin to Ching–Yi Chen. Sometime around the delivery of the third parcel, Lee and Yu, with Eng's permission, began selling the heroin themselves. Also, at about this time, Lee and Yu again traveled to Hong Kong, at Eng's direction, this time accompanied by Tina Wong and two other women. The five of them concealed more than half-a-million dollars on their persons for delivery to Ming.

The fourth parcel was delivered to "Helen," and then transferred to Wong's residence. Lee again sold part of the heroin in this parcel to Ching–Yi Chen. The fifth parcel arrived at Agnes Chin's residence, and was stored in Wong's house. Once again, Lee sold part of the heroin in the parcel to Chen. The sixth parcel was delivered in December 1987 or January 1988 to "Helen,"

who transferred it to Lee. The seventh parcel arrived at Gwendolyn Chan's residence, and was later delivered by Lee to a man named Dai Gow.

The eighth shipment arrived in January or February of 1988 at Agnes Chin's residence. The package was transferred to Lee, who delivered it to Eng by placing it in his jeep.

On February 9 and 10, 1988, three more boxes from Hong Kong containing heroin and addressed to residences in the New York metropolitan area arrived at customs in California. One of these packages was marked for delivery to a "M. Hsieh" at Gwendolyn Chan's address. The Drug Enforcement Administration then conducted a "controlled delivery," which resulted in Chan's arrest when she accepted delivery of the parcel. Chan agreed to cooperate, and the conspiracy began to unravel. Chan's cooperation led to the arrest of Leung, who also agreed to cooperate. Leung's cooperation led to the arrest of Lee, Yu, and Tina Wong in early March 1988.

The Government presented a somewhat different version of events in *United States v. Michael Yu, et al.*, No. 88–CR–138(S) (E.D.N.Y. Aug. 31, 1988). In that case, the Government prosecuted Eng's co-conspirators in the heroin importation scheme. The Government charged Wah Tom Lee and Michael Yu, along with four others, with conspiracy to distribute drugs and importation and distribution of heroin imported via mail parcels shipped to the United States from Hong Kong. The charges stemmed from the same mail parcel deliveries that formed the basis for the indictment against Eng.

In *Yu*, the Government argued that Tina Wong had delivered the first two packages to Ching–Yi Chen, while in the instant case the Government claimed that Wong delivered the first package to Eng (via Lee) and the second package to "Lap" (at Eng's direction). In the Government's version of events as portrayed at the instant trial, Ching–Yi Chen shows up as a buyer only late in the scheme when Yu and Lee had begun selling the drugs themselves.

The Government explains its changed version of Chen's role as resulting from a reevaluation of Tina Wong's veracity. After the *Yu* trial, the Government interviewed Wong and gave her a polygraph examination. Following its reconsideration of Wong's testimony, the Government agreed to the vacation of Ching–Yi Chen's conviction in light of the new information. On this appeal, the Government admits that Johnny Eng's name was not mentioned in the earlier trial: "At no time during the *Yu* trial was Johnny Eng's name mentioned, since Lee and Yu were the persons in the heroin conspiracy with the most direct dealings with Eng, and they were defendants." Brief for United States at 20, n. 8.

Eng was in custody in Hong Kong from August 16, 1989, until he was extradited to the United States on November 1, 1991. He was convicted following a four week jury trial on all counts related to the drug courier and mail package importation schemes, but was acquitted on the charges stemming from the alleged bean sprout machine scheme. Eng was convicted of the following crimes: continuing criminal enterprise ("CCE"), 21 U.S.C. § 848(a); conspiracy to distribute and possess with intent to distribute heroin, 21 U.S.C. §§ 846, 841(b); importation of heroin, 21 U.S.C. § 952(a); and distribution and possession with intent to distribute heroin, 21 U.S.C. § 841(a)(1). He was sentenced on the CCE count under the 1987 version of the Sentencing Guidelines to 151 months imprisonment followed by 3 years of supervised release. He was sentenced on each of counts 3 through 14 (the substantive drug offenses) to 292 months imprisonment followed by a life term of supervised release. All the sentences run concurrently.

## Discussion

### I. Evidence from prior trial

■ Eng contends that the District Court abused its discretion when it refused to admit the Government's summation, bill of particulars, and grand jury testimony from the *Yu* trial. The evidence that Eng sought to introduce showed that the Government had argued in *Yu* that Tina Wong had delivered the first two packages to Ching–Yi Chen; in the instant case, the Government's evidence showed that Wong had delivered the first

package to Eng (via Lee), and the second package to "Lap" (at Eng's direction). Tina Wong had testified in *Yu* that she had delivered the first two packages to Ching–Yi Chen. When Eng first moved to admit the evidence from the earlier trial, Judge Raggi denied the motion primarily because she believed that the inconsistency between the Government's position at the two trials would be fully presented to the jury when Tina Wong was called to testify. Judge Raggi explained:

> Most importantly, I think, this issue doesn't have to be addressed because witnesses whose credibility is, after all, at issue, are all available for this jury to hear.
>
> Indeed, defense has candidly stated it will call Tina Wong if the government does not? [punctuation in original]
>
> This is the witness that the government put forward at the Yu trial who has not told the truth or affirmatively perjured her[ ]s[elf].
>
> I think the appropriate way to present this whole conflict to the jury is to have all of these witnesses testify before it and let the jury s[ee] them, their relative demeanors, their credibility in light of other evidence and resolve the question whether or not the government has sustained its burden of proof.
>
> As I indicated the other day, I will allow the defense to explore with Ms. Wong, if she's called, the fact that she was called by the government in the prior trial, she did receive a 5K1.1 letter. . . .
>
> Just as I would never allow the government to vouch for a witness, whether that witness had appeared for the first time or six times previously and believed all the other times, so I will not allow the defense to put in what I see as really extraneous factors with considerable risks for prejudice, when in essence *it can make it[ ]s argument effectively by calling the witnesses themselves and having them testify about the prior occasion* on which they have testified [emphasis added].

The District Court did not exceed its discretion in refusing to admit the evidence at that stage on the basis of defendant's assurance that Tina Wong would testify. The Court assured the defendant that he would have a full opportunity to present the issue of the Government's inconsistency when Tina Wong took the stand. Eng had represented to the Court that Tina Wong was available, and that she would be called to testify. Eng Memorandum to the District Court at 3, n. 1 (Nov. 19, 1992) ("It is expected that Tina Wong will be called as a witness at this trial, if not by the government, then certainly by the defense.").

As it turned out, neither the Government nor Eng called Tina Wong to the witness stand. Because Eng failed to renew his motion once it became clear that Wong was not going to be called by either side, he never afforded the District Court an opportunity to consider the need for the evidence from the prior trial under the changed circumstances. He thereby waived his right to object to the District Court's failure to admit the Government's bill of particulars and summation, along with the agent's grand jury testimony. To hold otherwise would allow a defendant to trap the District Court into creating reversible error. The Seventh Circuit has held that if evidence is admitted conditionally, the party seeking to exclude the evidence has the burden of renewing its objection if the condition is not satisfied. *See United States v. Dougherty*, 895 F.2d 399, 403–04 (7th Cir.), *cert. denied*, 497 U.S. 1008, 110 S.Ct. 3249, 111 L.Ed.2d 759 (1990). The same reasoning applies with equal force here where evidence was, in effect, conditionally excluded.

## II. Multi-count sentencing

Eng argues that, in calculating the appropriate offense level, the District Court misapplied the multi-count provisions of the Sentencing Guidelines. Eng claims that because he was convicted of the continuing criminal enterprise offense, which includes a leadership role within its elements, the District Court could not make a four-level increase in his offense level for his leadership role in the crime.

 The District Court, applying the multiple-count sentencing guidelines, U.S.S.G. § 3D1.1–.5 (1987), treated all fourteen counts as being part of one "group."

The Court then aggregated the drug quantities under counts 3 through 14 (the non-CCE counts),[1] producing a total of 228 kilograms of heroin. *See id.* § 3D1.2(d).[2] The Court then observed that the guideline for the substantive drug offenses under 21 U.S.C. §§ 952, 846, and 841(a)(1) is section 2D1.1(a)(3). That guideline provides a base offense level of 36 for offenses involving at least 10 kilograms of heroin. Because the offenses involved 228 kilograms of heroin, the base offense level was 36. The Court then increased that offense level by 4 to account for the defendant's leadership role in the crime. *See id.* § 3B1.1(a). The Court then compared this adjusted offense level of 40 with the offense level of 32 produced by the remaining, non-aggregated count of the group, the CCE count. Because the offense level produced by the aggregated drug offenses was higher than that produced by the CCE count, the Court used the higher offense level of 40 as the combined offense level for the entire group. *See id.* § 3D1.3(b).

Eng argues that the Court erred in using the offense level for a substantive count as the offense level for the group. He argues that the Court should have used the offense level for the CCE count because that was the most serious count of conviction. We disagree. The Guidelines establish that when counts are grouped together under the quantity aggregating principles of section 3D1.2(d), the offense level for the group is

> the offense level corresponding to the aggregated quantity, determined in accordance with Chapter Two and Parts A, B and C of Chapter Three. When the counts involve varying offenses, apply the offense guideline that produces the highest offense level.

*Id.* § 3D1.3(b). Thus, the CCE offense could have served as the basis for the combined offense level for the group only if it carried an offense level greater than that carried by the aggregated substantive counts. Because "the offense level corresponding to the aggregated quantity," adjusted for leadership role under Part B of Chapter Three, was greater than the offense level for the CCE offense, the Court properly used it as the basis for the group. Though the Guidelines refer to the CCE count as "one of the most serious forms of ongoing criminal activity," U.S.S.G. § 2D1.5, commentary (1987), that reference does not mean that the CCE count must always determine the offense level for a group.

█ Eng also contends that the Court made a second mistake in its multi-count analysis. The Court applied the role adjustment under Part B of Chapter Three to the offense level for the aggregated counts, and then compared that offense level with the offense level for the CCE count, before arriving at the combined offense level for the group. Eng argues that the Court should have first compared the base offense levels for the aggregated counts and the CCE count, picked a combined offense level for the group, and *then* made any adjustments under Parts A, B, and C of Chapter Three. If the Court had done so, Eng continues, it would not have increased his offense level by 4 for his leadership role because that role would have already been accounted for by the inclusion of the CCE offense. Eng relies on a note in the 1992 Guidelines to support his theory that the Guidelines require the Court to group the counts and *then* adjust the combined offense level for the group according to the requirements of Parts A, B, and C of Chapter Three. *See* U.S.S.G. § 3D1.3, comment. (n. 3) (1992). The note advises that offense level adjustments under Parts A, B, and C of the Guidelines should be made "based upon the combined offense behavior

---

1. Count 2, charging a conspiracy to distribute and possess heroin with intent to distribute, was merged into count 1, the CCE count.

2. The 228 kilograms consists of heroin imported in all of Eng's various drug-smuggling schemes. It includes 78 kilograms of heroin smuggled in through the bean sprout washing machine, even though Eng was acquitted of the charges related to the washing machine. We have ruled that

facts established by a preponderance of the evidence may generally be used at sentencing, notwithstanding an acquittal for lack of proof that persuaded the trier beyond a reasonable doubt. *See United States v. Concepcion*, 983 F.2d 369, 387 (2d Cir.1992), *reh'g in banc denied*, 983 F.2d 395 (2d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993).

taken as a whole." *Id.* Eng misunderstands this note's direction, which simply means that courts should consider more than just a defendant's conduct on a particular count when applying Chapter Three, Parts A, B, and C adjustments. *See United States v. Fells,* 920 F.2d 1179, 1184 (4th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2831, 115 L.Ed.2d 1000 (1991). The note does not suggest that a court must apply Chapter Three, Parts A, B, and C adjustments to the offense level for the group as a whole.[3] *See also* U.S.S.G. § 1B1.1(d) (1987) (requiring sentencing court to apply Chapter Three, Parts A, B, and C adjustments before applying Chapter Three, Part D grouping analysis).

### III. The lifetime supervised release term

Finally, Eng contends that the District Court erred in imposing a lifetime supervised release term. He offers two separate arguments for a reversal of the lifetime term, the second of which he makes in response to an issue we raised at oral argument.

#### 1. Improper departure claim

■ First, Eng argues that the District Court erred in departing upward from the Guidelines' maximum of five years supervised release. *See* U.S.S.G. § 5D3.2(a) (1987). He contends that the District Court violated the *ex post facto* clause of the Constitution by departing upward on a ground not available under the 1987 Guidelines, but only under the 1988 Guidelines. Specifically, Eng asserts that Judge Raggi departed upward because of the quantity of the drugs involved in Eng's drug-smuggling operation. He says that this was an improper ground for departure under the 1987 Guidelines because they already took the amount of drugs into account in setting offense levels. Because of this, Eng concludes that when Judge Raggi departed upward, she must have relied on a

1988 amendment that allowed such upward departures.[4] This argument is without merit because Judge Raggi could have departed upward on the basis of the amount of drugs even under the 1987 Guidelines.

Judge Raggi explained her departure as follows: "I know that Mr. Eng's criminal history category is one, but the facts in this case do show to the Court that he was involved in large scale heroin trafficking for a considerable period of time, and I do think that the five year supervised release term is inadequate." Thus, Judge Raggi departed upward because of the scale of Eng's smuggling operation.

A sentencing judge may depart from the Guidelines range when "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b) (1988). This departure authority applies to terms of supervised release just as it does to terms of imprisonment. *United States v. Marquez,* 941 F.2d 60, 64 (2d Cir.1991).

We first note that the District Court departed upward on the substantive narcotics counts, not on the CCE count. The Court could not have departed upward on the CCE offense based on the quantity of heroin involved here (228 kilograms) because the 1987 Guidelines for the CCE offense already accounted for drug quantity. *See* U.S.S.G. § 2D1.5(a)(3) (1987) (imposing offense level of 43 for CCE offense involving 300 kilograms of heroin).

However, with respect to smuggling offenses, the 1987 Guidelines do not make any distinctions between defendants based on quantities in excess of 10 kilograms. Thus, in the 1987 Guidelines, the Sentencing Commission did not adequately consider the pro-

---

**3.** We note, however, that adjustments for acceptance of responsibility under Part E of Chapter Three are made only after the counts are combined. *See United States v. Kleinebreil,* 966 F.2d 945, 953 (5th Cir.1992); *United States v. McDowell,* 888 F.2d 285, 293 (3d Cir.1989).

**4.** Eng apparently thinks the Judge relied on an amendment to U.S.S.G. § 2D1.5, comment. (n.2)

(1988), which specifically permitted a departure above the offense level for a continuing criminal enterprise offense if "the quantity of drugs substantially exceeds that required for level 36." *Id.* App. C, no. 66 (1988). This language was removed the following year. *Id.* App C. no. 139 (1989).

priety of terms of supervised release beyond those in the Guidelines range to deal with an extremely large heroin trafficking operation. The District Court was therefore entitled to depart from the supervised release Guidelines' range in order to devise a sentence that reflected its concern over the scale of Eng's narcotics activities.

### 2. Lifetime supervised release violates statutory maximum claim

■ At oral argument, we raised a second issue concerning the lifetime term of supervised release—whether the term violates 18 U.S.C. § 3583(b), which appears to set maximum terms of supervised release.[5] The specific question is whether a life term of supervised release violates 18 U.S.C. § 3583(b)(1), which sets a maximum supervised release term of five years for Class A or B felonies,[6] "[e]xcept as otherwise provided."

Eng was convicted under 21 U.S.C. § 841(b)(1)(A), subjecting him to a supervised release term of "at least 5 years" as a first offender. Eng contends that because the minimum term (under section 841(b)(1)(A)) coincides with the maximum term (under section 3583(b)(1)) at five years, Judge Raggi should have set the supervised release term at exactly that period. The Government disagrees, arguing that section 3583(b)(1)'s general maximum of five years does not apply in Eng's case because section 841(b)(1)(A) overrides that maximum. We agree with the Government.

The question of how to reconcile the supervised release maximums of section 3583(b) with the supervised release terms allowed under section 841(b) is one of first impression in this Circuit. There are three variations of the problem. The first variation arises where section 841(b) provides a minimum term of supervised release that is *less than* the maximum term of supervised release specified in section 3583(b). This can happen when a defendant faces a four-year supervised release minimum under section 841(b)(1)(B) and a five-year supervised release maximum under section 3583(b)(1). A second category of cases, which includes the instant case, arises where the minimum term specified in section 841(b) is the *same as* the maximum term specified in section 3583(b). This can occur when the defendant is sentenced for a class A felony under section 841(b)(1)(A), and is thus subject (as a first-time offender) to a minimum supervised release term of five years and a maximum term also of five years (for a class A offense). The third category arises where section 841(b) provides a minimum term of supervised release that is *more than* the maximum specified in section 3583(b). That can occur when a defendant has a prior conviction; for example, section 841(b)(1)(A) sets the minimum supervised release term for a repeat offender at 10 years and section 841(b)(1)(B) sets the minimum at eight years, both above the five year maximum of section 3583(b).

Section 3583(b)'s maximums apply unless other statutes provide otherwise. 18 U.S.C. § 3583(b) ("Except as otherwise provided, the authorized terms of supervised release are....."). Cases in the third category described above clearly fall under the "except as otherwise provided" exception to the general maximum of section 3583(b) because they *require* a supervised release term higher than the maximum allowed by section 3583(b). The question presented is whether the second category also falls under that exception to section 3583(b) requirements. We hold that it does. Eng's reading of this provision would render the "at least" portion of the statute irrelevant. We generally avoid constructions that render portions of a statute superfluous. *See United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955). More importantly, Eng's construction ignores the fact that the supervised released terms authorized by Congress for drug offenses, including section 841, were added in the same statute that amended section 3583(b) by add-

---

5. We inquired about this issue *sua sponte* because an imposition of a sentence in violation of law would be plain error. *See United States v. Pico,* 966 F.2d 91, 92 (2d Cir.1992).

6. Class A felonies are those for which a maximum punishment of life imprisonment or death is authorized; Class B felonies are those for which a maximum penalty of 20 years or more is authorized. 18 U.S.C. § 3559(a)(1)(A), (B).

ing the introductory phrase "Except as otherwise provided." Act of Oct. 27, 1986, Pub.L. No. 99–570, 1986 U.S.C.C.A.N. (100 Stat.) 3207. It is apparent that in enacting the Narcotics Penalties and Enforcement Act of 1986 (a subtitle under the Anti–Drug Abuse Act of 1986), Congress intended to enhance the penalties available to combat drug offenses. That Congress intended these penalties to override the maximums set by 18 U.S.C. § 3583(b) is clear from the fact that Congress simultaneously amended that section to add the phrase "[e]xcept as otherwise provided." *See United States v. LeMay,* 952 F.2d 995, 998 (8th Cir.1991) ("It is obvious to us that the phrase 'except as otherwise provided' was added to § 3583(b) so that this statute would not conflict with statutes such as 21 U.S.C. § 841(b)(1)(A) that authorize supervised release terms in excess of five years."); *United States v. Salazar,* 784 F.Supp. 1366, 1367 (N.D.Ill.1992); *see also United States v. Cardenas,* 917 F.2d 683, 687 (2d Cir.1990) (noting, in dictum, that defendant could receive a life term of supervised release under section 841(b)(1)(C)'s mandate of a term of "at least 3 years"). Though it would be possible, as Eng argues, to interpret the "except as otherwise provided" clause to authorize longer supervised release terms only where another statute specifically requires such terms (*i.e.,* the third category, described above), we think it is evident that Congress expected the proviso to have a broader effect. *But see United States v. Gracia,* 983 F.2d 625, 630 (5th Cir. 1993) (section 3583(b) applies to set maximum supervised release term for defendant sentenced for Class C felony); *United States v. Kelly,* 974 F.2d 22, 24–25 (5th Cir.1992) (same). Accordingly, we hold that the District Court did not violate 18 U.S.C. § 3583(b) when it sentenced Eng to a lifetime term of supervised release following his term of incarceration.[7]

The judgment of the District Court is affirmed.

---

**7.** Because we do not find the penalty statute to be ambiguous, we have no occasion to apply the rule of lenity in Eng's favor. *See United States v. Concepcion,* 983 F.2d at 380.